No. 22-14302

In the

# United States Court of Appeals
## for the Eleventh Circuit

New Georgia Project, Inc., *et al.*,

*Plaintiff-Appellees*,

v.

Attorney General, State of Georgia, *et al.*,

*Defendant-Appellants*.

On Appeal from the United States District Court for the
Northern District of Georgia, Atlanta Division.
No. 22-CV-03533 — Victoria M. Calvert, *Judge*

## BRIEF OF STATE DEFENDANTS

Bryan K. Webb
 *Deputy Attorney General*
Russell D. Willard
 *Senior Asst. Attorney General*
Elizabeth Young
 *Asst. Attorney General*

Christopher M. Carr
 *Attorney General of Georgia*
Stephen J. Petrany
 *Solicitor General*
James E. Barrett
 *Honors Fellow*
Office of the Georgia
 Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for Appellants*

*New Georgia Project, Inc. v. Attorney General*, No. 22-14302

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

I hereby certify that the following persons and entities may have an interest in the outcome of this case:

Barrett, James, Honors Fellow, Counsel for Defendants

Boggs, Lisa, Administrative Law Judge, Georgia Office of Administrative Hearings

Branch, Aria, Counsel for Plaintiffs

Burge, David, member of the Georgia Government Transparency and Campaign Finance Commission, Defendant

Calvert, Victoria M., U.S. District Court Judge

Carr, Christopher M., Attorney General for the State of Georgia, Defendant

Elf, Randy, Amicus Curiae

Elias Law Group, LLP, Counsel for Plaintiffs

Emadi, David, Executive Secretary of the Georgia Government Transparency and Campaign Finance Commission, Defendant

Fox, David R., Counsel for Plaintiffs

Fry, John, Administrative Law Judge, Georgia Office of Administrative Hearings

Georgia Department of Law, Counsel for Defendants

*New Georgia Project, Inc. v. Attorney General*, No. 22-14302

Georgia Government Transparency and Campaign Finance
Commission, Non-Party

Hicks, Darryl, member of the Georgia Government Transparency
and Campaign Finance Commission, Defendant

Kreyenbuhl, James D., Chair of the Georgia Government
Transparency and Campaign Finance Commission,
Defendant

The Law Office of Bryan L. Sells, LLC, Counsel for Plaintiffs

Mixon, Meaghan E., Counsel for Plaintiffs

New Georgia Project Action Fund, Inc., Plaintiff

New Georgia Project, Inc., Plaintiff

Petrany, Stephen John, Solicitor General, Counsel for Defendants

Sells, Bryan L., Counsel for Plaintiffs

Thompson, Rick, member of the Georgia Government
Transparency and Campaign Finance Commission,
Defendant

Stoy, Jr., Lee M., Assistant Attorney General, Counsel for
Defendants

Watts, Robert A., Vice Chair of the Georgia Government
Transparency and Campaign Finance Commission,
Defendant

Webb, Bryan K., Deputy Attorney General, Counsel for
Defendants

Willard, Russell D., Senior Assistant Attorney General, Counsel
for Defendants

*New Georgia Project, Inc. v. Attorney General*, No. 22-14302

Young, Elizabeth T., Assistant Attorney General, Counsel for
  Defendants

/s/ *Stephen J. Petrany*
Stephen J. Petrany

## STATEMENT REGARDING ORAL ARGUMENT

The State Defendants request oral argument in this case. The district court's order denied *Younger* abstention and issued a sweeping preliminary injunction that barred Georgia campaign finance disclosure laws and the State Defendants' related ongoing state civil enforcement proceeding against Plaintiffs. That order raises important issues that warrant oral argument.

# TABLE OF CONTENTS

**Page**

Statement Regarding Oral Argument ............................................... i

Table of Authorities ................................................................ iv

Jurisdiction .......................................................................... ix

Statement of Issues ................................................................. 1

Introduction ........................................................................... 2

Statement of the Case ............................................................... 8

    A.  Statutory and regulatory background ................................. 8

        1.  Georgia's campaign finance disclosure laws .................. 8

        2.  The Government Transparency & Campaign Finance Commission ................................................... 13

    B.  Factual background .......................................................... 15

    C.  Procedural history ........................................................... 17

        1.  The Commission finds reasonable grounds to believe that New Georgia Project failed to disclose millions of dollars in election spending ........................................... 17

        2.  New Georgia Project files a federal suit to enjoin the Commission proceeding ................................................. 20

        3.  The federal district court grants a preliminary injunction. .................................................................... 21

    D.  Standard of review .......................................................... 24

Summary of Argument ............................................................ 25

# TABLE OF CONTENTS
## (continued)

Page

Argument ........................................................................ 29

I.  The district court should have abstained under *Younger*
    because the state proceeding was "ongoing" when New
    Georgia Project filed suit in federal court. ......................... 29

    A.  The state proceeding began no later than when the
        Commission found "reasonable grounds" to prosecute. 31

    B.  Even if the state proceeding began when the case
        transferred to OSAH, that still predated any
        "proceedings of substance on the merits" in federal
        court. ............................................................ 37

II. The district court erroneously granted a preliminary
    injunction where Georgia's disclosure laws are valid and
    the equities weigh against New Georgia Project. .............. 40

    A.  Because Georgia's campaign finance disclosure laws
        are valid, New Georgia Project is likely to lose on the
        merits. ........................................................... 41

        1.  Georgia's campaign finance disclosure laws are
            narrowly tailored to the legitimate public purposes
            of election transparency and educating voters........ 42

        2.  Georgia need not limit its campaign finance
            disclosure requirements to organizations with the
            "major purpose" of influencing elections. ................ 50

        3.  Georgia's campaign finance disclosure laws are not
            facially invalid......................................... 56

    B.  The equities weigh against a preliminary injunction... 63

Conclusion..................................................................... 66

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez,*
 138 S. Ct. 2305 (2018) .............................................................. 65

*Alabama v. U.S. Army Corps of Eng'rs,*
 424 F.3d 1117 (11th Cir. 2005) ..........................................24, 25

*Americans for Prosperity Found. v. Bonta,*
 141 S. Ct. 2373 (2021) ........................................................*passim*

*Broadrick v. Oklahoma,*
 413 U.S. 601 (1973) ............................................................28, 57

*\*Buckley v. Valeo,*
 424 U.S. 1 (1976) ................................................................*passim*

*Byrne v. Karalexis,*
 401 U.S. 216 (1971) ................................................................. 35

*CBS Broad., Inc. v. EchoStar Commc'ns Corp.,*
 265 F.3d 1193 (11th Cir. 2001) ..........................................26, 40

*\*Citizens United v. FEC,*
 558 U.S. 310 (2010) ...........................................................*passim*

*Costello v. Wainwright,*
 525 F.2d 1239 (5th Cir. 1976) ............................................38, 39

*\*Ctr. for Individual Freedom v. Madigan,*
 697 F.3d 464 (7th Cir. 2012) ..............................................*passim*

*Doran v. Salem Inn, Inc.,*
 422 U.S. 922 (1975) .......................................................7, 32, 39

*Family PAC v. McKenna,*
 685 F.3d 800 (9th Cir. 2012) .........................................45, 59, 60

*FEC v. Mass. Citizens for Life, Inc.*,
    479 U.S. 238 (1986) ......................................................49, 52, 63

*For Your Eyes Alone, Inc. v. City of Columbus*,
    281 F.3d 1209 (11th Cir. 2002) ...........................................37, 38

*Frazier ex rel. Frazier v. Winn*,
    535 F.3d 1279 (11th Cir. 2008) ................................................ 57

*Gaspee Project v. Mederos*,
    13 F.4th 79 (1st Cir. 2021) ............................................50, 53, 60

*Hicks v. Miranda*,
    422 U.S. 332 (1975) ......................................................*passim*

*Huffman v. Pursue, Ltd.*,
    420 U.S. 592 (1975) ................................................................ 31

*Hum. Life of Wash. Inc. v. Brumsickle*,
    624 F.3d 990 (9th Cir. 2010) ................................................... 51

*Justice v. Hosemann*,
    771 F.3d 285 (5th Cir. 2014) ...........................................8, 45, 49

*Maryland v. King*,
    567 U.S. 1301 (2012) (Roberts, C.J., in chambers)................... 65

*McConnell v. FEC*,
    540 U.S. 93 (2003) .............................................................10, 48

*Members of City Council of City of L.A. v. Taxpayers for Vincent*,
    466 U.S. 789 (1984) ...........................................................57, 61

\*Middlesex Cnty. Ethics Comm'n v. Garden State Bar Ass'n,
    457 U.S. 423 (1982) ................................................31, 32, 33, 34

*Minn. Citizens Concerned for Life, Inc. v. Swanson*,
    692 F.3d 864 (8th Cir. 2012) ................................................... 62

*N.C. Right to Life, Inc. v. Leake*,
525 F.3d 274 (4th Cir. 2008) .................................................53, 54

*Nat'l Org. for Marriage v. McKee*,
649 F.3d 34 (1st Cir. 2011)....................................................49, 54

*Nken v. Holder*,
556 U.S. 418 (2009) ................................................................ 65

*Sampson v. Buescher*,
625 F.3d 1247 (10th Cir. 2010) ............................................... 62

*SpeechNow.org v. FEC*,
599 F.3d 686 (D.C. Cir. 2010) (en banc)............................*passim*

*Sprint Commc'ns, Inc. v. Jacobs*,
571 U.S. 69 (2013) .........................................................5, 30, 31

*Steffel v. Thompson*,
415 U.S. 452 (1974) ................................................................ 32

*Tokyo Gwinnett, LLC v. Gwinnett Cnty.*,
940 F.3d 1254 (11th Cir. 2019) ...............................26, 31, 37, 38

*Trump v. United States*,
No. 22-13005, 2022 WL 4366684 (11th Cir. Sept. 21,
2022) ....................................................................................... 64

*United States v. Wayerski*,
624 F.3d 1342 (11th Cir. 2010) ............................................... 61

*Virginia v. Hicks*,
539 U.S. 113 (2003) .............................................................57, 62

*Vt. Right to Life Comm., Inc. v. Sorrell*,
758 F.3d 118 (2d Cir. 2014)..................................................... 53

*Wash. State Grange v. Wash. State Republican Party*,
552 U.S. 442 (2008) .............................................................58, 61

*Worley v. Fla. Sec'y of State,*
    717 F.3d 1238 (11th Cir. 2013) ..........................................*passim*

*Wreal, LLC v. Amazon.com, Inc.,*
    840 F.3d 1244 (11th Cir. 2016) ................................................. 65

*Younger v. Harris,*
    401 U.S. 37 (1971) .............................................................. 1, 32

**Statutes**

O.C.G.A. § 21-5-2 ............................................................................ 8

O.C.G.A. § 21-5-3 .............................................................3, 9, 10, 12

O.C.G.A. § 21-5-4 ......................................................................... 13

O.C.G.A. § 21-5-6 ................................................................*passim*

O.C.G.A. § 21-5-9 ......................................................................... 13

O.C.G.A. § 21-5-30 ................................................................... 4, 11

O.C.G.A. § 21-5-32 ................................................................... 4, 11

O.C.G.A. § 21-5-34 ................................................................*passim*

O.C.G.A. § 21-5-36 ....................................................................... 46

O.C.G.A. § 21-5-41 ....................................................................... 10

O.C.G.A. § 21-5-42 ....................................................................... 10

O.C.G.A. § 50-13-13 ..................................................................... 14

O.C.G.A. § 50-13-17 ..................................................................... 14

O.C.G.A. § 50-13-41 ..................................................................... 15

**Other Authorities**

Charles Alan Wright & Arthur R. Miller, 17B *Fed.*
  *Prac. & Proc.* § 4253 (3d ed. 2022) ............................................ 32

Ga. Comp. R. & Regs. 189-2-.05 ................................................... 15

Ga. Comp. R. & Regs. 189-2-.08 ................................................... 15

Ga. Comp. R. & Regs. 189-6-.04 ................................................... 10

Ga. Gov. Transparency & Campaign Fin. Comm'n
  Advisory Op. No. 2001-32,
  https://ethics.ga.gov/advisory-opinion-no-2001-32/ .................. 10

## JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs sued under 42 U.S.C. § 1983, raising a federal constitutional challenge to Georgia's campaign finance disclosure laws. This Court has appellate jurisdiction under 28 U.S.C. § 1292. State Defendants filed a timely notice of appeal on December 22, 2022, Doc. 33, eight days after the district court granted a preliminary injunction on December 14, 2022, Doc. 31.

## STATEMENT OF ISSUES

1. Whether the district court should have abstained under
   *Younger v. Harris*, 401 U.S. 37 (1971), when Plaintiffs
   commenced a federal suit to stop an ongoing state civil
   enforcement action.

2. Whether the district court erred in preliminarily enjoining all
   of Georgia's campaign finance disclosure requirements for
   ballot committees and independent committees.

## INTRODUCTION

This case is about whether New Georgia Project can spend millions of dollars in express political advocacy, fail to disclose *any* of it to the appropriate Georgia authorities (in violation of Georgia law), fight state investigators for years to avoid disclosing any information, and then rush to federal court to enjoin those reasonable disclosure statutes rather than defend itself in an ongoing state proceeding. The district court said yes, New Georgia Project may circumvent ordinary legal rules in this way, and preliminarily enjoined Georgia's disclosure laws for ballot committees and independent committees. This Court should reverse.

Georgia, like most states and the federal government, requires groups that spend above a certain threshold on express political advocacy—that is, explicit advocacy for or against a particular candidate or ballot proposition—to disclose those expenditures, as well as where the money comes from. These sorts of disclosure laws are an area of relative calm in the otherwise controversial storm of campaign finance regulation, because disclosure requirements "impose no ceiling on campaign-related activities," and "do not prevent anyone from speaking." *Citizens United v. FEC*, 558 U.S. 310, 366 (2010) (citation omitted). Given

their limited burdens, disclosure rules need only serve an "important governmental interest," and be "narrowly tailored" to serve that interest. *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2385 (2021) (citation omitted). That is why, from the seminal *Buckley v. Valeo* onward, the Supreme Court has virtually always upheld campaign finance *disclosure* requirements against challenge, even while repeatedly holding invalid *limits* on expenditures. 424 U.S. 1 (1976).

Georgia's unremarkable disclosure rules are similar to numerous other rules upheld by various courts (including this one), and they are narrowly tailored. At issue are two different rules, covering "independent" committees and "ballot" committees. O.C.G.A. § 21-5-3(2), (15). The disclosure rules for independent committees require only that every group that spends at least $100 in express political advocacy must register with Georgia's Government Transparency and Campaign Finance Commission and disclose basic details about expenditures and contributions over that amount. § 21-5-34(f). That's it. The ballot committee rules require slightly more, but with a higher dollar threshold. There, any group or individual that spends at least $500 in express advocacy for a specific ballot proposition must register with the Commission and disclose its expenditures and

3

contributions (just as independent committees do), and then it must also comply with minimal organizational requirements like designating a treasurer and a separate bank account for campaign funds. §§ 21-5-30, 32, 34. These ballot-committee requirements are less burdensome than the Florida scheme this Court upheld just a few years ago in *Worley v. Florida Secretary of State*, 717 F.3d 1238 (11th Cir. 2013).

Nevertheless, in 2018 and 2019, New Georgia Project and New Georgia Project Action Fund (together, New Georgia Project), which has described itself as a "voter registration, organizing, and advocacy" group that supports candidates and ballot measures in "local and state political campaigns," Doc. 1 at 8–9; Doc. 22-6 at 5, flagrantly violated these laws. New Georgia Project spent millions of dollars in electoral advocacy, yet did not register with the Commission or disclose a dime. In 2019, the Commission, following its ordinary procedures, began investigating a complaint against New Georgia Project, which fought tooth and nail to avoid disclosure. The Commission ultimately obtained bank records after a years-long subpoena battle. The Commission then held a formal hearing, found reasonable grounds that New Georgia Project had violated the law, and directed the Attorney General to

4

continue prosecuting the case on the Commission's behalf via Georgia's Office of State Administrative Hearings.

At this point, years after it decided to violate Georgia law, years after the Commission's investigation began, and weeks after the Commission formally found reasonable grounds to prosecute, New Georgia Project sued in *federal* court, seeking to enjoin the *state* proceeding. This is the paradigmatic scenario for *Younger* abstention. New Georgia Project's very purpose in suing was to "interfere[] with" a state proceeding. *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013).

The district court erroneously refused to abstain because, in its view, the state proceeding did not begin until the Commission, through the Attorney General, temporarily transferred the case to Georgia's Office of State Administrative Hearings. But that is wrong for two reasons. First, the state proceeding began no later than when the Commission held a hearing, issued its finding, and directed the Attorney General to further prosecute the case. Second, even if the state proceeding only "began" when the Attorney General officially transferred venue to a different state administrative office, that happened before *anything* "of substance on the merits [had] taken place in the federal court." *Hicks v. Miranda*, 422 U.S. 332, 349 (1975). The district court failed to

5

grapple with *Hicks*, which makes clear that *Younger* applies until the federal court has done *something* on the merits.

Even assuming the district court could hear the case, this Court should reverse its decision and vacate the preliminary injunction. The disclosure requirements are narrowly tailored to—indeed, are likely the least restrictive means of—enforcing the State's important interest in "transparency" and "[e]ducating voters." *Worley*, 717 F.3d at 1246, 1248 (citation omitted). Georgia's regulations are hard to distinguish from regulatory schemes that the Supreme Court and this Court have repeatedly upheld. *Id.*; *Buckley*, 424 U.S. at 80–81; *see Citizens United*, 558 U.S. at 366. The district court was concerned that the ballot committee requirements apply to individuals, but there is nothing in campaign finance case law that suggests individuals are exempt from disclosure requirements. Even if there were, that would—at most—support an as-applied challenge by an individual, not facially enjoining ballot committee disclosure requirements in their entirety to exempt New Georgia Project, a multi-million-dollar enterprise.

And for the independent committee disclosure requirements—which don't even apply to individuals—the district court identified no problem with their tailoring. New Georgia Project argued that

6

disclosure requirements cannot apply to its millions in express advocacy because it does not have the "major purpose" of political advocacy, but that argument is barred by Supreme Court precedent, which specifically allows for disclosure requirements with respect to groups that engage in express electoral advocacy, even if it is not their "major purpose." *Buckley*, 424 U.S. at 80–82.

On top of everything else, the equities weigh heavily against New Georgia Project. It cannot show any irreparable harm from allowing the state proceeding to go forward: A state proceeding warrants *abstention*, not an injunction. New Georgia Project can make all the same constitutional arguments in that proceeding that it makes here. And the State's interest in enforcing its disclosure laws is obviously strong, especially where New Georgia Project specifically *chose* to violate those laws and deal with the consequences rather than litigate *first*. New Georgia Project "cannot now be heard to complain that its constitutional contentions are being resolved in a state [proceeding]." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 929 (1975). This Court should reverse.

## STATEMENT OF THE CASE

After a years-long investigation, the Georgia Government Transparency & Campaign Finance Commission found reasonable grounds to believe that New Georgia Project had violated state campaign finance disclosure laws. New Georgia Project then filed this federal suit and moved to preliminarily enjoin the pending state civil enforcement proceeding, and the district court erroneously granted the motion.

### A. Statutory and regulatory background

Like most states and the federal government, Georgia requires disclosure of electoral spending above a certain threshold. *See Justice v. Hosemann*, 771 F.3d 285, 289 (5th Cir. 2014) (collecting example state laws). The relevant statutory requirements are then enforced by the Commission.

### 1. Georgia's campaign finance disclosure laws

Georgia's Government Transparency and Campaign Finance Act "protect[s] the integrity of the democratic process and [] ensure[s] fair elections." O.C.G.A. § 21-5-2. The Act requires "public disclosure of campaign contributions and expenditures" in all state, county, and municipal elections, including for recalls and referendums. *Id.* The Act's nuanced requirements distinguish

between different organizations and different electoral expenditures.

To begin, the Act differentiates between "campaign committees" and "independent committees." O.C.G.A. § 21-5-3. As their name implies, campaign committees play a central role in elections. They include "candidate[s], person[s], or committee[s]" that accept "contributions or make[] expenditures designed to bring about the nomination or election of an individual to any elected office," or to support or defeat referenda or ballot propositions. § 21-5-3(2).

Independent committees are defined separately and are subject to different requirements. An independent committee is a group, (1) "other than a campaign committee, political party, or political action committee," that (2) receives "donations" from supporters, and (3) "expends such funds" to "advocate the election or defeat" of a particular candidate. O.C.G.A. § 21-5-3(15).

Both independent committees and campaign committees may collect "contributions" and make "expenditures." O.C.G.A. §§ 21-5-3(2); 34(f)(1). A contribution is "anything of value conveyed … for the purpose of influencing" an election or ballot proposition. § 21-5-3(7). And an "expenditure" means the payment of "anything of

value" for the "purpose of influencing" the election of a candidate or a ballot proposition. § 21-5-3(12).

Georgia law makes clear that these terms refer only to *express* advocacy. *See* Ga. Gov. Transparency & Campaign Fin. Comm'n Advisory Op. No. 2001-32, https://ethics.ga.gov/advisory-opinion-no-2001-32/; Doc. 31 at 11. That is, the Supreme Court long ago distinguished between "express" electoral advocacy (explicitly promoting election or defeat of a candidate) and so-called "issue" advocacy (speech not directly tied to a particular election). *See Buckley*, 76 U.S. at 80; *McConnell v. FEC*, 540 U.S. 93, 190 (2003), *overruled on other grounds by Citizens United*, 558 U.S. 310. Georgia's campaign finance regulations at issue here apply only to *express* advocacy.

With respect to contribution and expenditure *limits*, only candidates and their campaign committees are so circumscribed. O.C.G.A. §§ 21-5-41–42. That is, independent committees have *no limits* on what they can accept or spend (as long as they do not coordinate with a candidate or her committee). *See id.*; Ga. Comp. R. & Regs. 189-6-.04. Likewise, a campaign committee that seeks to approve or reject a ballot measure (a "ballot committee") has no limits on how much it can receive or spend. *See id.*

But there are registration and disclosure requirements that apply to independent committees and ballot committees. Initially, if a group accepts contributions or makes expenditures, it must register with the Commission. O.C.G.A. §§ 21-5-30(b); 34(f)(1).

Ballot committees—but not independent committees—are subject to a few organizational requirements: they must designate a "chairperson and a treasurer" (one person may fill both roles) and maintain a "campaign depository account" to hold any received funds. O.C.G.A. § 21-5-30(b), (c). The treasurer must keep up-to-date accounts that track all contributions, expenditures, and activity in the campaign depository account. § 21-5-32. The Commission may ask to inspect the accounts at any time, and records must be preserved for three years. *Id.*

And then, of course, both independent and ballot committees must regularly file "disclosure reports" with the Commission. O.C.G.A. § 21-5-34(a), (f). Both must provide the same general information in their disclosure reports. For contributions or expenditures over $100, they must disclose the amount, the date received (or spent), the name, address, and employment information of the contributor (or spender), and for expenditures, the general purpose. § 21-5-34(b)(1)(A)–(B), (f)(2)(A)–(B). They must also disclose the total expenditures made during the

11

reporting period and the net balance on hand. § 21-5-34(b)(1)(D), (f)(2)(C). And they must disclose any "corporate, labor union, or other affiliation" of any contribution over $100. § 21-5-34(b)(1)(E), (f)(2)(D).[1]

Ballot committees must provide slightly more information, including basic lending and repayment details for campaign loans, "the cash on hand brought forward from the previous election cycle," any "investment" of campaign funds and resulting "profit or loss," and "[t]otal debt." O.C.G.A. § 21-5-34(b)(1)(C), (D)(i), (F), (G). Ballot committees are also subject to an exception: unless they spend or receive over $500, they are not considered a regulated committee at all. § 21-5-34(a)(2)(A).[2]

---

[1] The Act contains numerous exemptions. The Act excludes, for instance, natural and artificial persons making candidate contributions of up to $25,000 per year, and anyone who gives to only one candidate per year, O.C.G.A. §§ 21-5-3(19), 34(e).

[2] Besides twice yearly reports, independent committees must file disclosure reports "[o]n the first day of each of the two calendar months preceding any such election; [t]wo weeks prior to the date of such election; and [w]ithin the two-week period prior to the date of such election the independent committee shall report within two business days any contributions or expenditure of more than $1,000.00." O.C.G.A. § 21-5-34(f)(1). Ballot committees must file disclosure reports yearly and "75, 45, and 15 days prior to the date of the election." § 21-5-34(h).

To sum up: ballot committees are defined as anyone who receives or spends $500 or more in express advocacy on a ballot proposition. Ballot committees must register with the Commission, designate a chairperson and treasurer, maintain records of contributions and expenditures, and keep a separate account for campaign funds. Ballot committees must disclose contributions and expenditures of $100 or more.

Independent committees are groups (not individuals) that receive contributions or spend money on express advocacy (without coordinating with a campaign). They need only register with the Commission and disclose amounts in excess of $100.

### 2.   The Government Transparency & Campaign Finance Commission

The Act also establishes the five-member Commission, which has authority to monitor campaign finance spending, investigate violations, and pursue enforcement proceedings. O.C.G.A. §§ 21-5-4(b), 6, 9. The Act entrusts the Commission with broad authority to pursue civil (and, through the Attorney General, criminal) actions against those who violate the disclosure laws. *Id.*

The process begins when someone files a "written complaint" alleging a "violation of any provision" of the Act. O.C.G.A. § 21-5-6(b)(9), (10)(A). The Commission may "issue subpoenas to compel

13

any person to appear, give sworn testimony, or produce documentary or other evidence." § 21-5-6(a)(5). At this stage, the Commission need not "give notice" or "conduct a hearing." § 21-5-6(b)(10).

When the Commission finds "reasonable grounds to believe that a violation has occurred," formal procedural requirements kick in, and the Commission must proceed with a full evidentiary hearing "conducted in all respects in accordance with" the Georgia Administrative Procedure Act. O.C.G.A. § 21-5-6(b)(10)(A). This includes the opportunity "to be represented by legal counsel" and "to respond and present evidence on all issues involved," and requires a final decision either "in writing or stated in the record" that contains "findings of fact and conclusions of law." §§ 50-13-13(a)(3), 17(b). The Commission may then order the organization to "cease and desist from committing further violations," file the delinquent disclosure reports, or pay civil penalties. § 21-5-6(b)(14).

All that said, the Commission has other procedural avenues for prosecuting campaign finance violations; it need not do the work on its own. It may "institute and prosecute actions in the superior courts, in its own name, seeking to enjoin or restrain any violation" of the Act, and when it proceeds by civil administrative

enforcement action it may order parties to appear for an intermediate hearing before the Office of State Administrative Hearings. O.C.G.A. §§ 21-5-6(a)(6), 50-13-41(a)(1). And it may ask the Attorney General to bring a state court action on its behalf. § 21-5-6(b)(14)(C)(iii).

In practice, after the Commission holds a preliminary hearing and finds reasonable grounds that a violation has occurred, it usually moves to an intermediate hearing before the Office of State Administrative Hearings, rather than immediately finishing the process itself. *See* Ga. Comp. R. & Regs. 189-2-.05. After the hearing officer holds the hearing and issues a decision, a party may request the Commission's review, in which case the Commission retains "all the powers it would have [had] in making the [i]nitial [d]ecision" itself. *Id.* 189-2-.08(2)(d). After the "[r]eview [h]earing" before the Commission, it issues its final decision, which is then subject to judicial review. *Id.*; O.C.G.A. § 21-5-6(b)(10)(A).

## B.  Factual background

New Georgia Project is a 501(c)(3) tax-exempt nonprofit founded and first led by Stacey Abrams in 2014, and later led by Senator Raphael Warnock, that describes itself as an organization seeking "to build power with and increase the civic participation of

… Black, Latinx, AAPI and young Georgians … and other historically marginalized communities" through "voter registration, organizing, and advocacy." Doc. 1 at 8–9. New Georgia Project Action Fund is a 501(c)(4) tax-exempt nonprofit that, until (very) recently, described itself as an organization that engages in "local and state political campaigns, in support of, or opposition to, ballot measures, referendums, recalls, initiatives[,] and candidacies for local and state offices." Doc. 22-6 at 5. In litigation, it now claims its purpose "is not the nomination or election of candidates, but rather engagement in issue advocacy." Doc. 1 at 9.

As part of its efforts during the May and November 2018 elections, New Georgia Project "accepted contributions and made expenditures to advocate the election of Democratic candidates" including "Stacey Abrams," "Sarah Riggs Amico, Charlie Bailey," and others. Doc. 22-6 at 7, 115–25. New Georgia Project also "accepted contributions and made expenditures exceeding $500" to support a March 2019 Gwinnett County ballot initiative about public transit expansion. *Id.* at 10, 143–86. Preliminary estimates show that New Georgia Project spent millions in express electoral advocacy. *Id.* at 63–113.

16

Despite engaging in this extensive election spending, New Georgia Project did not register with the Commission as a ballot committee or independent committee, comply with the Act's requirements, or file campaign finance disclosure reports at the times required for the 2018 and 2019 elections. Doc. 1 at 12; Doc. 22-6 at 197–98, 200.

### C. Procedural history

#### 1. The Commission finds reasonable grounds to believe that New Georgia Project failed to disclose millions of dollars in election spending.

In September 2019, a Commission staff attorney filed a formal complaint with the Commission, alleging that New Georgia Project had engaged in significant election spending in 2018 and 2019 without registering with the Commission or filing any required disclosures. Doc. 1 at 12. The complaint stated that the funds New Georgia Project spent advocating on behalf of candidates qualified it as an independent committee and that the funds spent to support the transit expansion ballot issue qualified it as a ballot committee. Doc. 22-6 at 10.

The next day, the Commission subpoenaed New Georgia Project's bank records, campaign materials, and invoices to

investigate whether the organization had engaged in undisclosed election spending. *Id.* at 201. New Georgia Project filed a motion with the Commission to quash the subpoena, which was denied, but it continued to refuse to produce its bank records and other documents. *Id.* at 201–02. As a result, a few months later the Commission subpoenaed Wells Fargo Bank to produce the necessary records. *Id.* at 202.

Seeking to block the Commission once more, in March 2020 New Georgia Project moved to quash the subpoenas in state superior court. *Id.* In January 2021, the superior court denied the motions, finding that "[New Georgia Project] expressly advocated for [Democratic candidates] in the 2018 election cycle" by "canvassing," handing out express-advocacy "literature," "and operating field offices" to coordinate "electioneering activities." Doc. 22-1 at 2. And it held that New Georgia Project engaged in "canvassing," "phone banking," and producing "literature, signs, and social media" to support the ballot initiative. *Id.*; *see, e.g.*, Doc. 22-6 at 115–25. The court thus ordered Wells Fargo Bank to produce the bank records. Doc. 22-1 at 8. New Georgia Project's appeal was dismissed in September 2021, and its subsequent motion for relief from judgment was denied in March 2022. Doc. 22-3, 22-5.

A few months later, on June 17, 2022, a staff attorney at the Commission filed an amended complaint based on the information that could be gathered from New Georgia Project's bank records. Doc. 1 at 12. The amended complaint alleged that New Georgia Project violated O.C.G.A. § 21-5-34(f)(2) because it failed to disclose over $4.2 million in contributions and $3.2 million in expenditures during the "2018 primary, general, and run-off elections." Doc. 22-6 at 63, 66. And it alleged that New Georgia Project violated O.C.G.A. § 21-5-34(a)(2) when it failed to disclose $646,422 in contributions and $173,643 in expenditures to support the public transit ballot initiative. Doc. 22-6 at 108–09. The Commission notified New Georgia Project that it would hold a preliminary hearing to allow the organization to contest the allegations. Doc. 22-6 at 187.

New Georgia Project's hearing before the Commission took place on August 1, 2022. Doc. 22-6 at 188. New Georgia Project was represented by counsel at the preliminary hearing, with the opportunity to make arguments and present evidence. *Id.* Three days later the Commission issued an order finding "reasonable grounds" to conclude that New Georgia Project had broken the law. Doc. 22-6 at 188–91. It identified the specific dates on which New Georgia Project failed to file required campaign finance

disclosure reports and found reasonable grounds to believe that New Georgia Project failed to disclose over $4.8 million in contributions and over $3.3 million in expenditures. *Id.*

Following its standard practice, the Commission ordered New Georgia Project to participate in an evidentiary hearing before the Office of State Administrative Hearings (where the Georgia Attorney General would represent the Commission). *Id.* at 190. After this intermediate hearing, either New Georgia Project or the Attorney General could seek the Commission's final review (and then judicial review after that).

### 2.    New Georgia Project files a federal suit to enjoin the Commission proceeding.

Instead, New Georgia Project sued the Georgia Attorney General and the members of the Commission in federal district court a few weeks later. It asked the court to declare the Georgia Government Transparency and Campaign Finance Act unconstitutional, both facially and as applied to New Georgia Project, and enjoin its enforcement. Doc. 1. And New Georgia Project quickly followed up its complaint with a motion for preliminary injunction. Doc. 13. It argued that campaign finance disclosure requirements cannot be constitutionally applied to an organization unless it has "'the major purpose' of nominating or

electing a candidate." Doc. 13-1 at 14. In essence, despite spending millions of dollars on Georgia elections, New Georgia Project argued that it is constitutionally exempt from Georgia's campaign finance disclosure requirements because it supposedly spends millions more on *other* activities. *Id.* at 11–12.

On September 21, 2022, two weeks after the preliminary injunction motion was filed, the Attorney General transferred the state enforcement proceeding from the Commission to the Office of State Administrative Hearings for the intermediate hearing. Doc. 22-6 at 1. As required, the Commission provided the amended complaint, as well as a copy of its preliminary hearing order. *See* Doc. 22-6.

### 3. The federal district court grants a preliminary injunction.

Back in federal court, the Commission opposed New Georgia Project's attempt to forestall the state enforcement proceeding. Doc. 22. It argued that the proper response would be for the district court to abstain from exercising its jurisdiction under *Younger*, and that a preliminary injunction would be inappropriate. New Georgia Project was unlikely to succeed on the merits because it relied on the "repeatedly rejected" argument that state campaign finance disclosure laws cannot apply to

organizations that do not have a "major purpose" of electoral advocacy. *Id.* at 21. The district court held the preliminary injunction hearing, its first hearing in the case, on October 13, 2022, and then requested supplemental briefing on a series of questions about the meaning of various provisions of the Act. Doc. 26.

The district court issued its first substantive order in the case on December 14, 2022, granting New Georgia Project's preliminary injunction motion. Doc. 31. The court first refused to stay or dismiss the case under the *Younger* abstention doctrine. The court agreed with the parties that because the Commission was prosecuting New Georgia Project for violating Georgia's campaign finance disclosure laws, the state enforcement proceeding qualified as a "'civil enforcement proceeding[]' akin to [a] criminal prosecution[.]" *Id.* at 16, 20. But the court held that the state proceeding did not constitute an "ongoing state judicial proceeding" until the case was formally transferred to the Office of State Administrative Hearings on September 21, 2022. *Id.* at 13, 17, 21. The district court also recognized that "a state proceeding beg[u]n after the filing of a federal suit" still triggers deference as long as it "commenced before any proceedings of substance on the merits have taken place" in federal court, but it held that New

Georgia Project had somehow *unilaterally* proceeded to the merits by "securing service waivers" and filing a preliminary injunction motion. *Id.* at 18, 22.

Turning to the merits of the motion, the district court acknowledged (and all parties agreed) that the State's interests in information and transparency for voters were important and substantially related to the disclosure requirements. *Id.* at 25–26. The dispute thus centered on whether the laws were "[]sufficiently tailored." *Id.*

On the ballot-committee regulations, the district court rejected the notion that states can require disclosure only of "major purpose" organizations (albeit also holding that it can still be a factor in the analysis somehow). *Id.* at 48. But it held that the Georgia ballot committee requirements were facially unconstitutional anyway, primarily because it thought that organizational requirements should not apply to individuals and the $500 threshold was supposedly too low. *Id.* at 42, 48.

The district court also held that the independent committee regulations were unconstitutional, albeit with puzzling reasoning. It concluded "that the Act's regulation of independent committees is unconstitutionally overbroad for the same reasons [it] gave for ballot committees." *Id.* at 50. But the independent-committee

23

regulations include no organizational requirements (like designating a treasurer and maintaining a separate bank account) and apply only to groups (not individuals), so it is unclear what the district court thought undermined the independent committee requirements. It criticized the Act for being so broad that it "sweep[s] in any express advocacy," even though express advocacy is precisely the kind of advocacy subject to disclosure requirements. *Id.*

The district court barely addressed the remaining preliminary injunction factors, holding, essentially, that they must favor New Georgia Project because free speech rights were at stake. *Id.* at 52. The court then granted the motion, enjoined the Commission from enforcing the ballot-committee or independent-committee provisions of the Act, and ordered the State not to continue with the state enforcement proceeding. *Id.* at 53–54.

### D.  Standard of review

This Court reviews the decision to grant a preliminary injunction for abuse of discretion, but it reviews legal errors *de novo. Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1129 (11th Cir. 2005).

24

## SUMMARY OF ARGUMENT

A preliminary injunction is an "extraordinary and drastic remedy" and the district court erred in granting one here. *Id.* at 1136 (citation omitted). It should not have even heard the case, much less facially enjoined Georgia's run-of-the-mill campaign finance disclosure laws.

**I.** New Georgia Project violated the law for years and then filed suit in federal court at the eleventh hour to stop an ongoing state enforcement proceeding. Under *Younger*, district courts should not interfere with—let alone enjoin—an ongoing state enforcement proceeding. Because the state proceeding was pending first (no later than its reasonable-grounds order), it qualified as an "ongoing state judicial proceeding" that deserved *Younger* abstention.

Even under the district court's theory that the state proceeding did not "begin" until the Attorney General formally transferred venue to the state administrative hearings office, *Younger* abstention *still* applies because the state proceeding began "before any proceedings of substance on the merits" occurred in federal court. *Hicks*, 422 U.S. at 349. The district court ignored the relevant factors—"the time that the district court has spent considering the case, any motions ruled on, any discovery,

25

the number of conferences [or hearings] held, and any change in the parties' position as a result of the federal litigation," *Tokyo Gwinnett, LLC v. Gwinnett Cnty.*, 940 F.3d 1254, 1272 (11th Cir. 2019) (citation omitted)—and held that New Georgia Project single-handedly began substantive merits proceedings by "securing service waivers" and filing a preliminary injunction motion. Doc. 31 at 22. That is wrong and the district court cited no authority for that proposition.

**II.** Abstention aside, the district court also erred in granting a preliminary injunction. New Georgia Project is not substantially likely to succeed on the merits, it has identified no irreparable injury, and the Commission's (and the public's) interests weigh heavily against an injunction. *CBS Broad., Inc. v. EchoStar Commc'ns Corp.*, 265 F.3d 1193, 1200 (11th Cir. 2001).

**A.** New Georgia Project is not substantially likely to succeed on the merits because Georgia's campaign finance disclosure laws are narrowly tailored to advance the government's interests in election transparency and informing voters. As far back as *Buckley*, campaign finance disclosure requirements have been repeatedly upheld by the Supreme Court and other courts, including this one. Georgia breaks no new ground in requiring anyone spending over a certain threshold on express advocacy to

26

disclose as much. Similarly, the organizational aspects of the ballot-committee "disclosure scheme" (designating a treasurer, segregating accounts) add only a minimal burden because they "require little more" than what a "prudent person" would do anyway. *Worley*, 717 F.3d at 1243, 1250. Indeed, Georgia's laws are almost indistinguishable from the Florida campaign finance laws this Court upheld in *Worley*—and the independent committee requirements are *less* burdensome, since they require nothing more than registration and disclosure.

New Georgia Project argues that it should be exempt on the theory that *Buckley* permits campaign finance disclosure laws to apply only to organizations with a "major purpose" of express advocacy, but *Buckley* holds precisely the opposite. In *Buckley*, the Supreme Court distinguished between *express* electoral advocacy and non-election speech. 424 U.S. at 80. Express advocacy is the only kind at issue here, and the Supreme Court specifically held that non-major-purpose organizations *can* be required to disclose spending whenever they use the funds "for communications that expressly advocate the election or defeat of a clearly identified candidate." *Id.* The Court also held that major-purpose organizations can be required to disclose *all* of their spending,

27

whether express advocacy or not. *Id.* at 79. But that just means Georgia's requirements could be expanded *further*.

New Georgia Project's facial challenge fails as well, because Georgia's laws are not overbroad. The independent committee requirements are plainly valid. State Defendants are aware of no court that has invalidated similar disclosure requirements for express advocacy. And beyond disclosure, ballot committees must satisfy only minimal organizational requirements, less burdensome than those upheld in *Worley*, 717 F.3d at 1240.

To hold otherwise, the district court speculated about hypothetical outliers. In particular, the court was troubled that the ballot committee requirements apply to individuals. But there is nothing wrong with requiring individual disclosures, and *Buckley* cautions against nitpicking the dollar threshold for spending requirements. 424 U.S. at 83. Plus, even if a few outliers could succeed in an as-applied challenge, they would pale in comparison to the statute's "plainly legitimate sweep." *Bonta*, 141 S. Ct. at 2387 (citation omitted). Finally, if the concern is application of the ballot-committee organizational requirements to individuals, the proper course is to declare those organizational requirements invalid, not enjoin *everything*. *See, e.g.*, *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973).

28

**B.** A preliminary injunction was particularly inappropriate here because the equities weigh against it. New Georgia Project has identified no irreparable harm. The state proceeding, which may *eventually* lead to penalties and obligations, does not infringe on New Georgia Project's First Amendment rights any more than *this* adjudication infringes its rights. The state proceeding provides New Georgia Project with a forum to assert its rights through administrative and then judicial review. The district court's injunction has not prevented harm, but it has cut off a state judicial proceeding that would have provided New Georgia Project with all the same process this suit does.

On the other side of the ledger, the district court's injunction gravely interferes with Georgia's sovereignty and undermines Georgia's important public interest in ensuring election transparency and informing voters. A preliminary injunction is wholly improper.

## ARGUMENT

## I.  The district court should have abstained under *Younger* because the state proceeding was "ongoing" when New Georgia Project filed suit in federal court.

New Georgia Project filed this suit to stonewall an ongoing state civil enforcement proceeding. After years of contesting the

Commission's attempts to enforce Georgia's disclosure laws—even refusing to comply with subpoenas—New Georgia Project switched to federal court to stop the entire process. This concurrent federal suit raises more than just "the prospect of undue interference with state proceedings," so "federal-court abstention is required." *Sprint Commc'ns*, 571 U.S. at 72.

Yet not only did the district court fail to abstain, it enjoined the State from continuing its own proceeding while the federal litigation moves forward. This was error from top to bottom. The district court recognized—and it is uncontested—that the Commission enforcement action is the kind of proceeding that triggers *Younger* deference: it is a "state civil proceeding[] … akin to [a] criminal prosecution[]." *Id.*; Doc. 31 at 20. But the district court's analysis fell apart when it addressed whether the state proceeding was "ongoing." *Sprint Commc'ns*, 571 U.S. at 81.

The district court held that the Commission proceeding was not "ongoing" until the Commission transferred it to the state administrative hearing office, but that is wrong: it had been ongoing for at least weeks, if not years. And even if it only began when the transfer took place, that *still* predated any substantive development in the federal case, which is independently sufficient to require *Younger* abstention.

## A. The state proceeding began no later than when the Commission found "reasonable grounds" to prosecute.

For a court to apply *Younger* abstention, the relevant state proceeding must be "ongoing," "implicate[] important state interests," and "provide[] an adequate opportunity to raise federal challenges." *Id.* at 81 (alteration adopted); *Tokyo Gwinnett*, 940 F.3d at 1267–68. These "three *Middlesex* conditions" are "factors appropriately considered" by federal courts to confirm that a proceeding will fully "safeguard federal constitutional rights." *Sprint Commc'ns*, 571 U.S. at 81; *Middlesex Cnty. Ethics Comm'n v. Garden State Bar Ass'n*, 457 U.S. 423, 431–32 (1982). When a state civil enforcement proceeding satisfies these conditions, a federal court should not exercise its equity authority because to do so would disrupt the "State's efforts to protect the very interests which underlie its" laws. *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 605 (1975).

There can be (and is no) dispute that the Commission's civil action against New Georgia Project implicates "important state interests" and allows New Georgia Project a forum to "raise federal challenges." *Sprint Commc'ns*, 571 U.S. at 81 (alteration adopted). So the only remaining question is whether the

31

Commission proceeding was "ongoing" when New Georgia Project filed suit. It was.

A civil proceeding begins (that is, becomes an "ongoing" judicial proceeding) with the filing of a complaint. *Middlesex*, 457 U.S. at 433. Analogously, a state criminal prosecution begins when "an indictment has been returned," when a "criminal summons[ is] issued," or when "other formal charges [are] filed." Charles Alan Wright & Arthur R. Miller, 17B *Fed. Prac. & Proc.* § 4253 (3d ed. 2022); *see Younger*, 401 U.S. at 41; *Doran*, 422 U.S. at 929. In each scenario, the proceeding triggers *Younger* deference because it is "pending." *Steffel v. Thompson*, 415 U.S. 452, 461 (1974) (a "pending state proceeding, in all but unusual cases, [provides] the federal plaintiff with the necessary vehicle for vindicating his constitutional rights").

Here, the initial filing of a formal complaint against New Georgia Project was in September 2019. Doc. 22-6 at 201. New Georgia Project obstructed the process at every turn, but after finally obtaining bank records, the Commission filed an amended complaint on June 17, 2022—again, well before New Georgia Project's suit here. The Commission then held a hearing on the complaint and issued a formal finding of "reasonable grounds" to believe that New Georgia Project had violated the law. *Id.* at 188.

Whether one picks the hearing date (August 1, 2022), or the Commission's order finding "reasonable grounds" to believe a violation occurred and requesting the Attorney General to continue prosecuting the case (August 4, 2022), the civil proceeding had *commenced* and was thus "ongoing" before this federal suit began. The Supreme Court's own cases demonstrate as much. In *Middlesex*, for example, the Court examined New Jersey's attorney discipline process, which involved "a three-tier procedure." 457 U.S. at 425. *First*, a local committee would receive a complaint, investigate, and find whether a "prima facie" case of misconduct existed, before holding a formal hearing and issuing a formal decision. *Second*, a state-wide review board would make "a *de novo* review." *Third*, the state supreme court would review *that* decision. *Id.* at 425–27. In *Middlesex*, the local committee found a prima facie case of misconduct and "served a formal statement of charges," but the attorney refused to attend the "formal hearing" and instead sued the committee in federal court. *Id.* at 426, 428–29. The Supreme Court held that *Younger* abstention was appropriate: the complex, multi-tier review process was "ongoing"—although even the *initial* stage was incomplete—because the overall proceeding was no doubt "judicial in nature,"

and that process began at the "filing [of the] complaint." *Id.* at 433–34 (citation omitted).

This case mirrors *Middlesex* in every relevant way, except that here, the Commission proceeded *further* down the road than the state authorities in *Middlesex*. Here, not only had a staff attorney filed an amended complaint, but the Commission held a hearing and made the specific finding of "reasonable grounds," requesting the Attorney General to continue the prosecution. Had the district court not intervened on New Georgia Project's behalf, that proceeding would have continued to a final administrative review (just as in *Middlesex*) before eventual review by the courts (again, just as in *Middlesex*).

Likewise, analogizing to criminal summonses and indictments as in *Doran* and *Steffel*, the proceeding here began at the latest when the Commission found reasonable grounds that New Georgia Project violated the Act. The request to the Attorney General "for further prosecution under the Administrative Procedure Act," Doc. 22-6 at 190, is akin to a criminal indictment, even assuming the earlier complaint and amended complaint were not.

The district court erred in holding otherwise. The district court agreed—as did New Georgia Project—that the process was

34

"judicial," Doc. 31 at 20, by the time it reached the intermediate hearing stage at the Office of State Administrative Hearings (OSAH). But the district court asserted that the Commission proceeding was not "judicial" in nature *until* the Commission transferred the complaint to OSAH. *Id.* That was error. The transfer did not begin a new civil enforcement proceeding, it was merely a detour for an intermediate hearing, before the case would return for a full review by the Commission. *Cf., e.g.*, *Byrne v. Karalexis*, 401 U.S. 216, 218 & n.2 (1971) (even a reindictment is considered part of the same proceeding as an original, dismissed indictment). The OSAH hearing is one part of a single process that begins with the Commission prosecuting the complaint and ends before the Georgia Supreme Court or the U.S. Supreme Court (if the defendant raises federal issues). When the Commission routes the proceeding through OSAH, it is akin to a temporary change in venue, not the start of a new proceeding—and the Commission's own hearing is every bit as much of the process as OSAH's. In fact, the Commission is not even required to use OSAH; it has statutory authority to skip right to its own final review and issue an order right away. O.C.G.A. § 21-5-6(b)(10)(A). Transferring to OSAH thus offloads some work onto a hearing officer, but the *proceeding* is still one-and-the-same.

Surely there is no material distinction between the Commission electing to hear the case itself versus working from a decision made by a state hearing officer from the State's generalist pool. As a practical matter, introducing such a distinction would simply deter the Commission from using OSAH, to avoid losing *Younger* deference—but interfering with state proceedings is exactly the harm that *Younger* seeks to avoid, not cause.

Finally, the district court suggested that, because the Attorney General transferred the case to OSAH the day before filing a response to New Georgia Project's motion, it bears the "hallmarks of an attempt to shore up Defendants' litigation position." Doc. 31 at 22. Nonsense. The Commission did not strategically begin its proceeding to cut off New Georgia Project's federal suit. It had been investigating New Georgia Project for *years* and formally began an enforcement proceeding *weeks* before New Georgia Project filed suit. The reason the transfer and the response came around the same time is because *New Georgia Project* filed federal suit shortly before the transfer to OSAH. It is New Georgia Project that yanked the Commission into federal court while in the midst of hearings in the state proceeding, and the district court's implication to the contrary is unfounded.

**B.  Even if the state proceeding began when the case transferred to OSAH, that still predated any "proceedings of substance on the merits" in federal court.**

Assuming that the state enforcement proceeding only "began" when the Attorney General transferred venue to OSAH, the district court *still* should have abstained. "[N]o contested matter ha[d] been decided" in the federal suit, and it was still in its "embryonic stage." *Tokyo Gwinnett*, 940 F.3d at 1268 (citation omitted).

When a state proceeding begins "against the federal plaintiffs *after* the federal complaint is filed but before any proceedings of substance on the merits have taken place in the federal court," *Younger* abstention still applies "in full force." *Hicks*, 422 U.S. at 349; *For Your Eyes Alone, Inc. v. City of Columbus*, 281 F.3d 1209, 1217 (11th Cir. 2002). To complete this case-specific assessment of the posture of the federal case, "courts look to [1] the time that the district court has spent considering the case, [2] any motions ruled on, [3] any discovery, [4] the number of conferences [or hearings] held, [5] and any change in the parties' position as a result of the federal litigation." *Tokyo Gwinnett*, 940 F.3d at 1272 (citation omitted).

37

*None* of these factors suggest the federal case had made any substantive movement on the merits—and, remarkably, the district court did not address any of them. Instead, it held that New Georgia Project had incurred the "expense of drafting [a preliminary injunction motion] and supporting brief and securing service waivers." Doc. 31 at 22. The district court did not locate any authority suggesting that this minimal activity somehow counts as "proceedings of substance on the merits," *Hicks*, 422 U.S. at 349, and it is hard to imagine how it could. If a plaintiff's unilateral decision to file suit, file a motion, and obtain service waivers is sufficient to overcome *Hicks*, then that case no longer has any meaning. In *every* case, a plaintiff can expend that effort.

This Court has made clear that "proceedings of substance on the merits" require merits-based action by the *court*. In *Tokyo Gwinnett*, for instance, the district court had entered a consent-based temporary restraining order and ruled on a motion to dismiss, and the defendants had also filed their answer and initial discovery disclosures. 940 F.3d at 1272. In *For Your Eyes Alone*, the court had already ruled on a motion for a temporary restraining order after briefing and an evidentiary hearing, and the defendant had filed a motion to dismiss, an answer, and a motion for summary judgment. 281 F.3d at 1218. And in *Costello*

*v. Wainwright*, the district court had already ruled on two full rounds of preliminary injunction litigation before a state court suit was filed. 525 F.2d 1239, 1245 (5th Cir. 1976), *reinstated,* 553 F.2d 506 (5th Cir. 1977) (en banc).

By holding that New Georgia Project's *unilateral* preliminary filings qualified as "proceedings of substance on the merits," the district court adopted a rule that, contrary to its own assertions, requires a "rac[e] to the courthouse." Doc. 31 at 21–22. That is improper under *Hicks*, not to mention that it undermines the very purpose of *Younger*. If New Georgia Project can delay and contest a state investigation for years and then race to the courthouse as soon as it becomes clear that a state proceeding is about to commence, *Younger* is no protection for state sovereignty.

The district court might believe that "Plaintiffs should not be faulted for attempting to resolve the matter before the Commission prior to resorting to litigation," Doc. 31 at 21, but that is not remotely what happened here. Instead, New Georgia Project "violated the [Act], rather than [pursue] the normal development of its federal lawsuit" first. *Doran*, 422 U.S. at 929. New Georgia Project "cannot now be heard to complain that its constitutional contentions are being resolved in a state [proceeding]." *Id.* Its attempt to have it both ways—violate State law, resist the state

39

proceeding, then run to federal court immediately before it believes a civil proceeding is set to begin—is *exactly* the sort of gamesmanship that *Younger* and its follow-on cases aim to preclude.

## II. The district court erroneously granted a preliminary injunction where Georgia's disclosure laws are valid and the equities weigh against New Georgia Project.

If this Court addresses the merits of the district court's order, it should reverse. Both the merits and the equities weigh against the "extraordinary and drastic remedy" of a preliminary injunction. *CBS Broadcasting*, 265 F.3d at 1200 (citation omitted) (a plaintiff must establish substantial likelihood of success on the merits, irreparable harm, and that its threatened injury outweighs the injury to the defendants and the public interest). Georgia's disclosure laws are ordinary, valid means to enforce the State's interest in transparency and educating voters, and New Georgia Project can point to no irreparable harm that needs immediate redress, much less that outweighs the public interest in enforcing Georgia's disclosure laws.

**A.  Because Georgia's campaign finance disclosure laws are valid, New Georgia Project is likely to lose on the merits.**

The district court made multiple legal errors in holding that New Georgia Project was likely to succeed on the merits of its claims. Indeed, the district court cited but did not correctly apply this Court's decision in *Worley*, 717 F.3d 1238, which upheld regulations almost identical to, if not more burdensome than, the statutes at issue here.

The Supreme Court has long held that campaign finance disclosure requirements are, "in most applications[,] … the *least restrictive* means of curbing the evils of campaign ignorance." *Buckley*, 424 U.S. at 68. Disclosure reveals where political "money comes from and how it is spent" and thus "provides the electorate with information" they need to vote in their best interests. *Id.* at 66 (citation omitted). At the same time, disclosure laws do not limit "campaign-related activities" or "prevent anyone from speaking." *Citizens United*, 558 U.S. at 366 (citation omitted).

Georgia's campaign finance disclosure laws break no new ground. They provide transparent information about election spending above certain dollar-thresholds, while imposing no limits on how much can be spent. Yet the district court *facially* enjoined them anyway, and that decision was error. The regulations are

41

clearly valid as applied to New Georgia Project, and even if they had invalid applications (which is highly doubtful), they would not be facially invalid given their "plainly legitimate sweep." *Bonta*, 141 S. Ct. at 2387 (citation omitted).

And even *if* certain portions of the regulations were somehow invalid (the district court could identify supposed problems only with respect to ballot committees), the district court enjoined the *entirety* of the regulations for ballot committees and independent committees, which was error. The correct response would have been to enjoin only any invalid portion, not give New Georgia Project a free pass to hide its spending because some minor aspect of the statute might be problematic for someone else.

**1. Georgia's campaign finance disclosure laws are narrowly tailored to the legitimate public purposes of election transparency and educating voters.**

Disclosure requirements strike a middle ground between those who advocate curtailing election spending and those who would eliminate campaign finance regulation altogether. *Citizens United*, 558 U.S. at 369. Disclosure regulations provide greater flexibility for election-related speech than other types of regulations, because they "impose no ceiling on campaign-related

42

activities and do not prevent anyone from speaking." *Id.* at 366 (citations omitted).

Although the Supreme Court has held invalid federal *limits* on independent expenditures and campaign expenditures under strict scrutiny, it has repeatedly upheld "recordkeeping, reporting, and disclosure" provisions under "exacting scrutiny," *Buckley*, 424 U.S. at 58–59, 64, 84. In *Citizens United*, for instance, the Court applied strict scrutiny to hold unconstitutional a federal limit on corporate independent expenditures, 558 U.S. at 341, but applied exacting scrutiny to the law's disclaimer and disclosure requirements (and upheld them). *Id.* at 366, 372.

State campaign finance disclosure requirements likewise comport with the First Amendment when they satisfy "exacting scrutiny." *Worley*, 717 F.3d at 1243. Under exacting scrutiny, "there must be a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Bonta*, 141 S. Ct. at 2383 (citation omitted). And unlike strict scrutiny, exacting scrutiny allows for more flexibility in the "narrow tailoring" between the government's interests and the means it uses to protect them. *Id.* at 2383–84. States need not structure their campaign finance disclosure regimes using only "the least restrictive means of achieving their ends." *Id.* at 2383.

Instead, narrow tailoring permits States to use any method, even
if it is not "the single best disposition," as long as it is
"reasonable." *Id.* at 2384 (citation omitted).

No one disputes that the State has a strong interest in
"provid[ing] the electorate with information as to where political
campaign money comes from and how it is spent by the candidate
in order to aid the voters in evaluating those who seek federal
office." *Worley,* 717 F.3d at 1245 (quoting *Buckley*, 424 U.S. at 66–
67). The State's interest in equipping voters to "make informed
choices in the political marketplace" is a sufficiently important
interest that it justifies the State's regulation even of independent
committees. *Citizens United*, 558 U.S. at 367 (citation omitted); *see
Buckley*, 424 U.S. at 66–67. "[T]ransparency enables the electorate
to make informed decisions and give proper weight to different
speakers and messages." *Worley*, 717 F.3d at 1245 (quoting
*Citizens United*, 558 U.S. at 371).

Disclosure regulations also advance the State's interest in
enforcing compliance with other campaign finance laws. The
"recordkeeping, reporting, and disclosure requirements are an
essential means of gathering the data necessary to detect
violations"—"[s]unlight is said to be the best of disinfectants;
electric light the most efficient policeman." *Buckley*, 424 U.S. at

44

67–68 (citation omitted). The State's informational interests extend equally to organizational requirements because they impose only a "minimal" burden while facilitating and ensuring compliance with the disclosure requirements. *SpeechNow.org v. FEC*, 599 F.3d 686, 697 (D.C. Cir. 2010) (en banc) (Sentelle, C.J.).

All of the above applies equally to the disclosure of spending on ballot propositions, as "[e]ducating voters is at least as important, if not more so, in the context of [ballot] initiatives," where the measure itself is "typically confusing," so knowing who is advocating for its passage gives voters "a pretty good idea of who stands to benefit." *Worley*, 717 F.3d at 1248 (citations omitted); *see Justice*, 771 F.3d at 298; *Family PAC v. McKenna*, 685 F.3d 800, 808 (9th Cir. 2012). In fact, "one of the most useful heuristic cues influencing voter behavior in initiatives and referenda is knowing who favors or opposes a measure." *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 480–81 (7th Cir. 2012). "[N]ominally independent political operations can hide behind 'misleading names to conceal their identity,' [so] often only disclosure of the sources of their funding may enable the electorate to ascertain the identities of the real speakers." *Id.* (citation omitted).

45

And it is common ground that Georgia's campaign finance disclosure laws are substantially related to its transparency and informational interests. *See* Doc. 31 at 25; *Buckley*, 424 U.S. at 80–81. Georgia's interests (election transparency and informing voters) and methods (registration and disclosure requirements) are long accepted in the campaign finance realm, and for good reason. *See, e.g.*, *Buckley*, 424 U.S. at 81–82; *Citizens United*, 558 U.S. at 371; *Worley*, 717 F.3d at 1250. The Act requires groups to disclose who is contributing funds to support a particular candidate or ballot referendum, and the Commission quickly publishes that information to voters. O.C.G.A. § 21-5-36(a)(1). It provides voters with the exact information that they need to cast informed votes. *Worley*, 717 F.3d at 1247–48.

Where the parties diverge—and where the district court went astray—is narrow tailoring. But Georgia's Act is narrowly tailored. The Supreme Court has held that campaign finance disclosure requirements are so well-tailored that they are usually "the *least restrictive means* of curbing the evils of campaign ignorance." *Buckley*, 424 U.S. at 68 (emphasis added). Registration and disclosure is the most hands-off method to provide for transparency and inform voters.

46

The district court and New Georgia Project thus resist what might be the closest thing to blackletter law in campaign finance: mandatory "disclosure of those expenditures that expressly advocate a particular election result"—no matter whether the spenders are "individuals and groups" or "candidates or political committees"—is constitutional. *Buckley*, 424 U.S. at 80; *SpeechNow.org*, 599 F.3d at 696; *Madigan*, 697 F.3d at 485. If anything, because "disclosure is a less restrictive alternative to more comprehensive regulations of speech," disclosure requirements in the election context can even be reasonably extended to speech *beyond* "express advocacy" or "the functional equivalent of express advocacy." *Citizens United*, 558 U.S. at 369.

Georgia's independent-committee requirements therefore are narrowly tailored, because they are only "reporting and registration requirements," which this Court has held "are not unduly burdensome." *Worley*, 717 F.3d at 1250; *see* O.C.G.A. § 21-5-34(f). The requirements here narrowly apply to "express advocacy," just like the federal law the Supreme Court upheld in *Buckley*. *See Citizens United*, 558 U.S. at 368–69. Since *Buckley*, disclosure has been the *preferred* method of campaign finance regulation. The district court did not identify a single case where a

47

court held that bare disclosure requirements for express advocacy are invalid.

Moving to ballot committees, these requirements are also narrowly tailored. Ballot committees must, like independent committees, register and disclose. They must also comply with a short set of organizational requirements: pick a chairperson and treasurer, maintain a separate bank account, and keep regular accounting.

Such organizational requirements are narrowly tailored because they "require little more if anything than a prudent person or group would do in these circumstances anyway." *Worley*, 717 F.3d at 1250. "The Supreme Court has consistently upheld organizational and reporting requirements against facial challenges" because they impose only a "minimal" burden. *SpeechNow.org*, 599 F.3d at 696–97; *Buckley*, 424 U.S. at 79–81; *McConnell*, 540 U.S. at 194–97. It is even reasonable to impose these requirements on small spenders, because the "relative simplicity" of an organization just makes satisfying the requirements that much easier. *SpeechNow.org*, 599 F.3d at 697; *see Worley*, 717 F.3d at 1250–51.

To be sure, at some point, burdens on electoral speech go too far—but the burdens have to go quite far indeed. For instance, in

*FEC v. Mass. Citizens for Life, Inc.,* 479 U.S. 238, 253–54 (1986), the Supreme Court accepted an as-applied challenge to regulations requiring speakers not only to appoint a treasurer and maintain detailed accounts, but also to set up a separate "political committee," file monthly disclosure reports governed by a slew of byzantine requirements (the list of requirements is too long and complicated to quote in full), and take in donations only from formal "members" of the organization. That is a far cry from Georgia's requirements.

Instead, Georgia's ballot committee requirements are barely distinguishable from the organizational and disclosure requirements upheld in *Worley*. 717 F.3d at 1241; *see also Justice*, 771 F.3d at 299 (upholding similar Mississippi law); *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 42, 58–59 (1st Cir. 2011) (upholding Maine's comparable requirements as "well tailored"). In *Worley*, the Court upheld a Florida law that required disclosing organizations to appoint a treasurer, maintain a campaign bank account, deposit funds within five days and use only checks, keep detailed accounts current to within two days, and submit to random audits. 717 F.3d at 1241, 1253. The Court held that the burden was minimal because any "group wanting to raise and spend money to influence an election" would want to follow these

49

steps regardless, particularly given that they facilitate the group's ability to file accurate disclosure reports. *Id.* at 1250.

And to top the analysis off, New Georgia Project is *precisely* the sort of organization that these laws target. New Georgia Project spent millions on electoral advocacy in 2018 and 2019. In *Buckley*, the Supreme Court held that individuals making contributions or expenditures totaling as little as one hundred dollars must disclose their spending. 424 U.S. at 75. In *Gaspee Project v. Mederos*, the law's threshold was $1000. 13 F.4th 79, 82 (1st Cir. 2021). In *Worley*, $500. 717 F.3d at 1240. New Georgia Project spent *orders of magnitude* above these thresholds, and it has no grounds to claim that it deserves some sort of special treatment.

> **2. Georgia need not limit its campaign finance disclosure requirements to organizations with the "major purpose" of influencing elections.**

New Georgia Project can't meaningfully argue with all of this authority, so it attempts to impose a new rule on campaign disclosure requirements. In New Georgia Project's view, states cannot require disclosure from an organization unless that organization has the "major purpose" of electoral advocacy. Doc. 1 at 8, 14; Doc. 23 at 12–14. That theory is bunk.

New Georgia Project takes its "major purpose" argument from *Buckley*, but that case *precludes* the argument. In *Buckley*, the Court recognized that the federal campaign finance disclosure statute at issue "could be interpreted to reach groups engaged *purely* in issue discussion"—thus improperly burdening *non-election* speech. 424 U.S. at 79 (emphasis added). To limit the statute to election-related speech (which the Court termed "express advocacy," *id.* at 45), the Court narrowly interpreted the statute in two ways. First, it held that the statute could require organizations with the "major purpose" of electoral advocacy to disclose *all of their speech. Id.* at 79. The burden on such organizations was "'by definition' substantially related to the government's interests when applied to organizations whose single major purpose was political advocacy." *Hum. Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1009 (9th Cir. 2010). In other words, essentially *everything* that a "major purpose" organization says and does can be *assumed* to be express advocacy, or something close to it. Therefore, the Court drew a commonsense conclusion: an organization with the major purpose of "nomination or election of a candidate," can be constitutionally required to disclose *all* of its speech. *Buckley*, 424 U.S. at 79. Second, the Court explained that the statute could regulate everyone else, that

51

is, all the *non-major-purpose* entities, when they "use[] [funds] for communications that expressly advocate the election or defeat of a clearly identified candidate." *Id.* at 80.

*Buckley* thus not only fails to support but affirmatively *rebuts* New Georgia Project's view that it can avoid campaign finance disclosure regulations by asserting that it lacks a major purpose of electoral advocacy. If it is a "major purpose" organization, campaign finance laws can constitutionally apply to *all* of its speech. If it is not, they can apply to, at minimum, its "express advocacy."

From a first principles perspective, that is the only view that makes sense: why should an entity be able to skirt campaign finance laws just because it spends money on things *other than* electoral advocacy? So it is no surprise that, post-*Buckley*, courts have consistently upheld broad disclosure requirements against constitutional challenges without limiting those requirements to "major purpose" organizations. For instance, in *Massachusetts Citizens for Life*, the Supreme Court upheld disclosure requirements on "organizations that only occasionally engage in independent spending on behalf of candidates" even as it held invalid certain restrictions on corporate *spending*. 479 U.S. at 262. And in *Citizens United*, the Court held that disclosure

requirements may reach *beyond* "express advocacy" to other "electioneering communications" precisely because "disclosure is a less restrictive alternative to more comprehensive regulations of speech." 558 U.S. at 367–69; *see also Gaspee Project*, 13 F.4th at 86; *Madigan*, 697 F.3d at 484; *SpeechNow.org*, 599 F.3d at 697. What matters is not *who* is speaking, but *what* they are speaking about.

Thus, with respect to the independent committee regulations, New Georgia Project's theory is a red herring. Independent committees are subject only to registration and disclosure of express advocacy, the exact form of disclosure *upheld* in *Buckley* and many other cases.

New Georgia Project's theory also fails when applied to the ballot committee organizational requirements (designating a treasurer, maintaining a bank account to track expenditures, etc.), although in that context a few courts have gone astray. For example, in *N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 287–90 (4th Cir. 2008), the Fourth Circuit held that organizational requirements can be imposed only on major-purpose organizations, but that court was simply confused, as other courts have explained. *E.g.*, *Vt. Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118, 136 (2d Cir. 2014); *Madigan*, 697 F.3d at 487–90;

*McKee*, 649 F.3d at 58–59. The Fourth Circuit accepted that states can require disclosure of all express advocacy. *Leake*, 525 F.3d at 281–82. But it held that states cannot impose the "burdens" of being designated a "political committee" (e.g., organizational burdens) unless an organization has the "major purpose" of electoral advocacy. *Id.* at 287.

But nothing in *Buckley* demands that organizations engaged in express advocacy not be subject to the minimal burden of, for instance, maintaining a treasurer and a separate bank account. The Fourth Circuit appears to have gotten tripped up by a simple fallacy. The court was rightly concerned about burdens on non-electoral speech, but it was wrong to believe that organizational requirements *burden* such speech where these requirements apply *only* to express advocacy. If an advocacy group allots part of its budget to election spending, complying with the Act's requirements affects only how much it can spend in the election, it does *not* affect the cost of non-electoral speech.

To use a simple analogy, suppose a grocery store requires registration and various burdensome steps for a customer to shop for liquor. Those requirements increase *only* the cost of buying liquor. They do not burden shopping for everything else in the store, any more than income tax burdens one's ability to speak

54

because it *generally* reduces your income. Likewise, if a State were to triple the cost of campaign finance compliance, that would burden only the group's election spending; the cost of the group's other work stays the same.

Limiting disclosure laws to "major purpose" organizations would also "yield perverse results" that favor huge spenders over small entities. *Madigan*, 697 F.3d at 489 (citation omitted). Under New Georgia Project's "major purpose" theory, a state could impose organizational requirements on a political committee that spends $3,000, but not on a "mega-group that spends $1,500,000 to defeat the same candidate" while "spend[ing] far more on non-campaign-related activities." *Id.* (citation omitted). Anyone with means could "circumvent the law with ease" by "merging with a sympathetic organization that engaged in activities unrelated to campaigning." *Id.* The constitution does not contain such counter-intuitive requirements.[3]

---

[3] The district court agreed that whether an organization has the "major purpose" of electoral advocacy is not dispositive, but held that it was still *relevant* to whether a regulation is narrowly tailored. Doc. 31 at 48. For the reasons explained, that makes no sense, at least in the context of a statute that reaches only express advocacy.

### 3.   Georgia's campaign finance disclosure laws are not facially invalid.

Even though Georgia's campaign finance disclosure laws are plainly valid as applied to New Georgia Project, the organization asserted—and the district court accepted—a facial challenge to the Act. The district court enjoined *every aspect* of every requirement for ballot committees and independent committees, almost entirely because the ballot committee regulations include organizational requirements and apply to individuals.

That holding is erroneous for at least two reasons. *First*, the district court was simply wrong: as explained above, the requirements *are* narrowly tailored, and nothing about including individuals makes them invalid. At the very least, the independent committee regulations—which do not cover individuals and do not include organizational requirements—are valid. *Second*, even if there were something wrong with application of the ballot committee regulations to individuals in certain cases, the hypothetical possibility that an outlier might succeed with an as-applied challenge does not make a law facially unconstitutional.

**a.** A facial challenge ordinarily fails unless the plaintiff can "establish that *no set* of circumstances exists under which the law would be valid or show that the law lacks a plainly legitimate

56

sweep." *Bonta*, 141 S. Ct. at 2387 (emphasis added, alterations adopted, citations omitted). In the First Amendment context a facial challenge can sometimes succeed when a law is "overbroad," meaning "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* (citation omitted). But that is rare, "strong medicine." *Virginia v. Hicks*, 539 U.S. 113, 119–20 (2003). And the overbreadth must be "real"; the "mere fact" that "one can conceive of some impermissible applications of a statute," does not render it overbroad. *Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984). The point of the overbreadth doctrine is to curtail laws that "chill" a significant and disproportionate amount of protected speech, not to undermine all laws with invalid applications. *Hicks*, 539 U.S. at 119–20.

And if a "limiting construction or partial invalidation" suffices to "remove the seeming threat" to speech, that is to be preferred to an all-encompassing injunction. *Broadrick*, 413 U.S. at 613; *Frazier ex rel. Frazier v. Winn*, 535 F.3d 1279, 1283 (11th Cir. 2008) ("[W]e will invalidate no more of the statute than we must."). Of course, that makes sense, because facial challenges "run contrary to the fundamental principle of judicial restraint that courts should … [not] formulate a rule of constitutional law

57

broader than is required by the precise facts to which it is to be applied." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) (citation omitted).

Under these standards, neither the ballot committee requirements nor the independent committee requirements are overbroad. Start with the ballot committee requirements. The Act covers any organization or individual that engages in significant ballot advocacy ($500 or more) because the voters need to know where campaign financing comes from to cast informed votes. And this Court has upheld such comprehensive regulations because "knowing the source of even small donations is informative in the aggregate and prevents evasion of disclosure." *Worley*, 717 F.3d at 1251.

The district court tried to sidestep *Worley*, claiming that because Georgia's ballot committee requirements apply to individuals and small "groups with limited resources" they are unconstitutionally overbroad. Doc. 31 at 50. The court was concerned that the law "renders anyone who spends $500" on a ballot proposition "a full-fledged campaign committee." *Id.* at 48.

But "there is nothing constitutionally magical about being labeled as a [campaign or ballot] committee; what matters are the burdens that attend the classification." *Madigan*, 697 F.3d at 488.

And the district court identified no constitutional rule that exempts individuals or small groups from disclosure requirements. Instead, by claiming to focus on the burden on small spenders, all the district court really did was attack the threshold amount for ballot committees.

And of all the aspects of campaign finance regulation, monetary thresholds deserve the most "deference." *Worley*, 717 F.3d at 1251–52 (citation omitted). This Court has explained that district courts should not quibble with these thresholds unless they are "wholly without rationality." *Id.*; *see also, e.g.*, *Family PAC*, 685 F.3d at 809 n.7. For "the choice of where to set such monetary thresholds is … best left in the context of this complex legislation to [legislative] discretion." *Worley*, 717 F.3d at 1251–52 (citation omitted). Legislatures must make a complicated call on this point, and are not required to choose "the highest reasonable threshold," even if a low threshold might "discourage participation by some citizens in the political process." *Buckley*, 424 U.S. at 83. A threshold of $500 is perfectly reasonable.

Turning to the requirements for independent committees: these are even *less* burdensome, and it is hard to identify anyone subject to these requirements who would arguably have a valid as-applied challenge (much less so many that the statute would be

overbroad). Independent committees do not include individuals, so the district court's concern with burdens on individuals does not apply. Likewise, the organizational requirements for ballot committees (appointment of a treasurer, etc.) do not apply to independent committees. *All* that independent committees must do is register and disclose their expenditures and contributions for express advocacy. As explained above, that is at the absolute *core* of what a State may require, which is why courts have repeatedly upheld similar disclosure requirements. *See, e.g., Buckley*, 424 U.S. at 80–81; *Citizens United*, 558 U.S. at 367; *Worley*, 717 F.3d at 1253; *Gaspee Project*, 13 F.4th at 89–90; *Madigan*, 697 F.3d at 483; *Family PAC*, 685 F.3d at 810; *SpeechNow.org*, 599 F.3d at 696–98.

Indeed, when discussing independent committees, the district court's order is barely coherent. The district court declared the independent committee disclosure requirements unconstitutional "for the same reasons the Court gave for ballot committees"—even though individuals do not qualify as independent committees and the Act does not impose ballot-committee organizational requirements on independent committees. Doc. 31 at 48, 50. These are separate regulatory schemes, and the district court should not have conflated them.

**b.** Even assuming that some groups or individuals should not be subject to the ballot committee organizational requirements when they spend $500 on express advocacy, the universe of potentially invalid applications is not only small but also hypothetical, and laws do not become facially invalid because of merely "conceiv[able] impermissible applications." *Taxpayers for Vincent*, 466 U.S. at 800. Neither New Georgia Project nor the district court explained how speculative concerns about hypothetical individuals justify holding the Act *facially* invalid. *Wash. State Grange*, 552 U.S. at 455; *United States v. Wayerski*, 624 F.3d 1342, 1349 (11th Cir. 2010) ("[H]ypothetical situations not before the Court will not support a facial attack on a statute."); *Madigan*, 697 F.3d at 482 (discounting speculated effect on individuals in facial challenge by a major "political advocacy organization"). Most covered organizations—like New Georgia Project itself—spend orders of magnitude above $500. No one has identified an individual spender who was categorized as a ballot committee, let alone so many that it could prove they make up a "substantial number" of organizations regulated by the Act. Intuition alone supports the point: how many individuals are *personally* spending more than $500 on ballot advocacy rather than contributing to a larger organization?

The district court and New Georgia Project pointed to some cases holding organizational requirements invalid, but those cases concerned *as-applied* challenges. Doc. 31 at 43–44; *see Worley*, 717 F.3d at 1249 (disregarding as-applied challenges in *Sampson v. Buescher*, 625 F.3d 1247 (10th Cir. 2010) and *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864 (8th Cir. 2012) as irrelevant). Even if it may be unconstitutional to apply a facially valid law to a *particular* organization—such as one that offers evidence that its members will "face threats, harassment, or reprisals if their names were disclosed"—that does not mean the law is *generally* invalid. *Citizens United*, 558 U.S. at 370.

And to repeat, even if certain *aspects* of the organizational requirements for ballot committees are too burdensome, that did not justify enjoining the disclosure requirements for ballot committees or any of the requirements for independent committees. "[P]artial invalidation" was the obvious, legally required choice: a simple injunction of the ballot committee organizational requirements would have sufficed. *Hicks*, 539 U.S. at 119 (citation omitted). The Supreme Court followed this course in *Massachusetts Citizens for Life*, rejecting complex organizational requirements (far more burdensome than anything here, *see supra* at 49) in part because it held that the remaining

*disclosure* requirements were perfectly valid. 479 U.S. at 262. By contrast, the district court used a wrecking ball to address a discrete, supposed problem, greatly undermining Georgia's state sovereignty without cause.

### B.  The equities weigh against a preliminary injunction.

The district court brushed aside the equities, seemingly holding that a preliminary injunction is *always* required in a First Amendment case. Doc. 31 at 52. That is wrong, and this case is a prime example of why.

To start, neither New Georgia Project nor the district court identified any irreparable harm. New Georgia Project claimed that its First Amendment rights are at risk because the state proceeding may end with an order to disclose "information on individual donations and expenditures," or because the information might come to light during the proceeding. Doc. 13-1 at 18–19. But if the state proceeding runs its course, the final order would issue only *after* New Georgia Project had the opportunity for judicial review in the Georgia Supreme Court and U.S. Supreme Court. O.C.G.A. § 21-5-6(b)(10)(A). The order would issue, therefore, only if the judiciary *upheld* the Act against a constitutional challenge.

63

Moreover, "if the mere threat of prosecution were allowed to constitute irreparable harm ... every potential defendant could point to the same harm and invoke the equitable powers of the district court." *Trump v. United States*, No. 22-13005, 2022 WL 4366684, at *8 (11th Cir. Sept. 21, 2022) (citation omitted). Upholding the district court's decision would cripple state enforcement authority.

Worse still, New Georgia Project's supposed solution shows its concerns to be a sham: the *same information* is at issue in this federal suit. New Georgia Project filed an as-applied challenge to the Act because, even under its theory, the State can require major-purpose organizations to disclose their advocacy. So New Georgia Project will need to produce its financial records—the very information it claims it cannot reveal—to prove that it is *not* a major-purpose organization. New Georgia Project's concern, then, is not really about First Amendment harm, but about its desire to be in a federal rather than a state forum.

New Georgia Project also asserted that the Act causes irreparable harm because it "chill[s] free speech," Doc. 13-1 at 18, but if New Georgia Project were really concerned not with the state proceeding but the statute more generally, it has had *years* to challenge the Act itself. "[D]elay … militates against a finding

64

of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). New Georgia Project was created in 2014; it waited *eight years* to challenge the Act, so any argument about irreparable harm is disingenuous.

On the other side of the ledger, the State's interests here, as well as the public interest, weigh heavily against an injunction. *Nken v. Holder*, 556 U.S. 418, 435 (2009) ("These factors merge when the Government is the opposing party."). "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted); *see also Abbott v. Perez*, 138 S. Ct. 2305, 2324, n.17 (2018) ("[T]he inability to enforce its duly enacted [statutes] clearly inflicts irreparable harm on the State."). Here, the district court took drastic measures, well beyond routine pre-enforcement injunction of a statute: It refused to abstain and shut down an ongoing state proceeding after a years-long investigation. It impounded Georgia's campaign finance laws while the parties litigate this case. Even if the Court ultimately concludes *Younger* abstention is not *required*, the preliminary injunction alone is well outside the norm. The injury to the State Defendants and the public demands reversal.

## CONCLUSION

For the reasons set out above, this Court should reverse the decision below and vacate the preliminary injunction.

Respectfully submitted.

/s/ *Stephen J. Petrany*

Bryan K. Webb
  *Deputy Attorney General*
Russell D. Willard
  *Senior Asst. Attorney General*
Elizabeth Young
  *Asst. Attorney General*

Christopher M. Carr
  *Attorney General of Georgia*
Stephen J. Petrany
  *Solicitor General*
James E. Barrett
  *Honors Fellow*

Office of the Georgia
  Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

66

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 12,797 words as counted by the word-processing system used to prepare the document.

/s/ *Stephen J. Petrany*
Stephen J. Petrany

## CERTIFICATE OF SERVICE

I hereby certify that on March 8, 2023, I served this brief by electronically filing it with this Court's ECF system, which constitutes service on all attorneys who have appeared in this case and are registered to use the ECF system.


*/s/ Stephen J. Petrany*
Stephen J. Petrany