# In the United States Court of Appeals for the Eleventh Circuit

NEW GEORGIA PROJECT, INC., et al., Plaintiffs-Appellees,

*v.*

ATTORNEY GENERAL OF GEORGIA, et al., Defendants-Appellants.

On Appeal from the United States District Court
for the Northern District of Georgia, Case No. 1:22-cv-03533-VMC
(Hon. Victoria M. Calvert)

## BRIEF OF THE INSTITUTE FOR JUSTICE AS AMICUS CURIAE IN SUPPORT OF APPELLEES AND AFFIRMANCE

Samuel B. Gedge
Anna J. Goodman
INSTITUTE FOR JUSTICE
 901 N. Glebe Road, Suite 900
 Arlington, VA 22203
 (703) 682-9320
 sgedge@ij.org
 agoodman@ij.org

### CERTIFICATE OF INTERESTED PERSONS AND
### CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure Rule 26.1 and Eleventh Circuit Rule 26.1-1, Amicus certifies that the certificate of interested persons filed by Defendant-Appellants is complete and adds the following interested entity and persons:

1.    Gedge, Samuel B. (counsel for Amicus Institute for Justice)

2.    Goodman, Anna J. (counsel for Amicus Institute for Justice)

3.    Institute for Justice, a 501(c)(3) nonprofit corporation (Amicus Curiae)

Amicus further certifies that the Institute for Justice has no parent corporation and that no publicly held corporation owns 10 percent or more of its stock.

Dated: May 15, 2023.

/s/ Anna J. Goodman
Anna J. Goodman
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
agoodman@ij.org

# TABLE OF CONTENTS

**Page**

Table of authorities.................................................................. ii

Identity and interest of amicus curiae ................................... 1

Statement of the issues ......................................................... 2

Summary of the argument...................................................... 2

Argument................................................................................ 5

I.    When a federal claim can readily be brought in an indisputably
      pre-enforcement posture, the concerns animating *Younger*
      abstention are implicated only marginally at most ................... 5

      A.    Appellees' First Amendment claim could be presented in an
            incontrovertibly pre-enforcement posture that would yield the
            same results as a plaintiff-side judgment here................ 6

      B.    Because *Younger* is a judge-made doctrine claiming its footing
            in equity, the federal courts can validly take account of the
            fact that *Younger* serves little purpose in a case like this one ....11

II.   Georgia's characterization of its campaign-finance laws in this case
      cannot be squared with the compliance requirements it imposes in
      the real world .............................................................14

      A.    In practice, Georgia's campaign-finance laws require that
            committees report every dollar received and every dollar
            spent.........................................................................14

      B.    Because Georgia's comprehensive reporting scheme applies
            to groups whose "major purpose" is not electoral, it likely
            violates the First Amendment.........................................17

Conclusion............................................................................21

Certificate of compliance ....................................................22

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ariz. Free Enter. Club's Freedom Club PAC* v. *Bennett*,
   564 U.S. 721 (2011)....................................................................................1

*Brown* v. *Hotel & Rest. Emps., Int'l Union Local 54*,
   468 U.S. 491 (1984)............................................................................ 13-14

*\*Buckley* v. *Valeo*, 424 U.S. 1 (1976)...............................................14, 15, 18, 19

*Citizens United* v. *FEC*, 558 U.S. 310 (2010)....................................................20

*Cobb Hosp., Inc.* v. *Dep't of Cmty. Health*,
   837 S.E.2d 371 (Ga. 2019) ...................................................................10

*Coal. for Secular Gov't* v. *Gessler*,
   71 F. Supp. 3d 1176 (D. Colo. 2014),
   *aff'd*, 815 F.3d 1267 (10th Cir. 2016).................................................9

*Dickinson* v. *Cochran*, 833 F. App'x 268 (11th Cir. 2020) ..................................9

*Dombrowski* v. *Pfister*, 380 U.S. 479 (1965)......................................................10

*Elrod* v. *Burns*, 427 U.S. 347, 373 (1976) ..........................................................10

*Hercules Carriers, Inc.* v. *Fla. Dep't of Transp.*,
   768 F.2d 1558 (11th Cir. 1985)...........................................................8

*Holland* v. *Williams*, 457 F. Supp. 3d 979 (D. Colo. 2018)................................1

*Inst. for Justice* v. *State*,
   No. 132101527, 2015 WL 1331982 (Wash. Super. Ct. Feb. 20, 2015)............1

*McCutcheon* v. *FEC*, 572 U.S. 185 (2014) ........................................................18

*Mulholland* v. *Marion Cnty. Election Bd.*,
746 F.3d 811 (7th Cir. 2014)..............................................................9

*Pennzoil Co.* v. *Texaco, Inc.*, 481 U.S. 1 (1987) ...................................12

*Rodgers* v. *Bryant*, 942 F.3d 451 (8th Cir. 2019) ...................................8

*Sampson* v. *Buescher*, 625 F.3d 1247 (10th Cir. 2010).........................1

*Snider* v. *City of Cape Girardeau*, 752 F.3d 1149 (8th Cir. 2014).....................9

*Speech First, Inc.* v. *Cartwright*, 32 F.4th 1110 (11th Cir. 2022) ......................7

*SpeechNow.org* v. *FEC*, 599 F.3d 686 (D.C. Cir. 2010) ........................1

*Sprint Commc'ns, Inc.* v. *Jacobs*, 571 U.S. 69 (2013) ..............................12, 13

*Steffel* v. *Thompson*, 415 U.S. 452 (1974) ...................................7, 11, 12

*Susan B. Anthony List* v. *Driehaus*, 573 U.S. 149 (2014)..................................6

*United States* v. *Mendoza*, 464 U.S. 154 (1984) .....................................8

*Van Hollen* v. *FEC*, 811 F.3d 486 (D.C. Cir. 2016)....................................18, 20

*Walker* v. *City of Calhoun*, 901 F.3d 1245 (11th Cir. 2018) ............................12

*Wis. Right to Life, Inc.* v. *Barland*, 751 F.3d 804 (7th Cir. 2014) ...................20

*Wis. Right to Life, Inc.* v. *Schober*, 366 F.3d 485 (7th Cir. 2004) ......................7

*Worley* v. *Fla. Sec'y of State*, 717 F.3d 1238 (11th Cir. 2013)......................1, 18

*Younger* v. *Harris*, 401 U.S. 37 (1971)..................................2, 10, 13, 14

**STATUTES AND REGULATIONS**

Ga. Code § 21-5-3(2)..............................................................14

Ga. Code § 21-5-3(15)......................................................................15

Ga. Code § 21-5-34(a)(2)(A)...........................................................14

Ga. Code § 21-5-34(b)(1)(F) ...........................................................19

Ga. Code § 21-5-34(b)(1)(G) ...........................................................19

Ga. Comp. R. & Regs. 189-4-.01(4) ................................................17

<u>**OTHER AUTHORITIES**</u>

Amanda Mariam McDowell, Note, *The Impact of* Clapper v. Amnesty
   International USA *on the Doctrine of Fear-Based Standing*,
   49 Ga. L. Rev. 247 (2014) .........................................................12

Anne Rachel Traum, *Distributed Federalism: The Transformation of*
   *Younger*, 106 Cornell L. Rev. 1759 (2021) ............................ 12-13

Campaign Contribution Disclosure Report, "Better Savannah"
   (Independent Committee) (Jan. 2, 2022), https://tinyurl.com/ycku9myb....17

Ga. State Ethics Comm'n Adv. Op. 2008-04 (Aug. 28, 2008)...........15

Ga. State Ethics Comm'n Adv. Op. 2010-05 (Apr. 5, 2011) ..............15

Howard M. Wasserman, *Precedent, Non-Universal Injunctions, and*
   *Judicial Departmentalism: A Model of Constitutional Adjudication*,
   23 Lewis & Clark L. Rev. 1077 (2020)...........................................8, 9

Matthew Strugar (@MatthewStrugar), Twitter (Apr. 10, 2023),
   https://tinyurl.com/3y7v9j9v.........................................................9

Maxine Bernstein, *State board halts inquiry into Allen Alley's use of*
   *word 'engineer,' places investigator on leave*, The Oregonian (Jan. 9,
   2019), https://tinyurl.com/47wfhwve ..........................................7

Michael L. Wells et al., Cases and Materials on Federal Courts
      (4th ed. 2007) ................................................................................12

Note, *Nonmutual Issue Preclusion Against States*,
      109 Harv. L. Rev. 792 (1996) ...................................................8

Note, *Developments in the Law: Section 1983 and Federalism*,
      90 Harv. L. Rev. 1133 (1977) ...................................................12

**IDENTITY AND INTEREST OF AMICUS CURIAE**

The Institute for Justice is a nonprofit law firm dedicated to securing greater protection for individual liberty. We have a depth of experience in the two issues presented in this appeal. On substance, we have litigated First Amendment challenges to campaign-finance laws across the Nation, including in such cases as *Arizona Free Enterprise Club's Freedom Club PAC* v. *Bennett*, 564 U.S. 721 (2011); *Worley* v. *Florida Secretary of State*, 717 F.3d 1238 (11th Cir. 2013); *Sampson* v. *Buescher*, 625 F.3d 1247 (10th Cir. 2010); *SpeechNow.org* v. *FEC*, 599 F.3d 686 (D.C. Cir. 2010) (en banc); *Holland* v. *Williams*, 457 F. Supp. 3d 979 (D. Colo. 2018); and *Institute for Justice* v. *State*, No. 132101527, 2015 WL 1331982 (Wash. Super. Ct. Feb. 20, 2015). On procedure, we are well-versed in the *Younger*-abstention doctrine and have a keen interest in the federal courts' resisting invitations to overextend it.[1]

---

[1] All parties have consented to the filing of this brief. No party or party's counsel authored this brief in whole or in part, and no party or party's counsel contributed money intended to fund the preparation or submission of this brief. No person—other than amicus—contributed money that was intended to fund the preparation or submission of this brief.

## STATEMENT OF THE ISSUES

1.    Whether the district court abused its discretion in declining to abstain under *Younger* v. *Harris*, 401 U.S. 37 (1971).

2.    Whether Georgia's disclosure laws regulating ballot committees and independent committees likely violate the First Amendment.

## SUMMARY OF ARGUMENT

The district court properly exercised jurisdiction over appellees' First Amendment claim and rightly entered a preliminary injunction in their favor.

I.    Appellees' brief ably presents the doctrinal reasons the district court properly denied the State's bid for *Younger* abstention. More broadly, the concerns animating *Younger* are implicated only marginally (if at all) in cases like this one. In the State's telling, federal courts' exercising jurisdiction over this First Amendment case would pose an intolerable risk of interfering with the State's enforcement apparatus. Realistically, however, countless federal plaintiffs could raise the same claim appellees have raised here. They could do so in an incontrovertibly pre-enforcement posture, meaning *Younger* would not even arguably apply. And they could secure a judgment with the same practical consequence as a judgment here: shutting down the challenged laws' enforcement statewide.

Given these realities of modern pre-enforcement litigation, deploying *Younger* in cases that could be brought by different plaintiffs in an indisputably pre-enforcement posture does not further any of *Younger*'s rationales. At the same time, the real-world harms are grave. The plaintiffs with the *most* concrete injuries are barred from federal court. They are consigned to trying to vindicate their constitutional rights defensively. Often, they must do so under the threat of escalating liability. And often, as in Georgia, they must navigate administrative courts that cannot even consider their constitutional claims. In short, applying *Younger* in cases like this one promises serious harms to constitutional rights, while doing nothing to further the rationales that purport to justify *Younger* in the first place. For this reason, too, the district court acted within its discretion in exercising jurisdiction over this case.

II.    On the merits, the State appears not to dispute the relevant standard: under the First Amendment, it cannot require independent groups to report "*all* of their spending" unless their "major purpose" is electoral. Appellants' Br. 27. Yet the State's laws demand just that. As the State acknowledges, the laws classify groups as ballot committees or independent committees whether or not their major purpose is electoral. Dist. Ct. Doc. 28, at 2. And in every forum but this one, the State makes clear that those committees must

report every dollar received and every dollar spent—whether or not those dollars had anything to do with electoral advocacy. It is impossible, in fact, to accurately fill out Georgia's campaign-finance forms in any other way.

The State asserts that its reporting requirements are far more modest. Contrary to all evidence, it posits that committees must report, not *all* their finances, but only "their expenditures and contributions for express advocacy" specifically. Appellants' Br. 60. Yet that view cannot be squared with the basic structure of the State's reporting system. Nor can it be squared with the administrative complaint against appellees, which appears to demand wholesale reporting of every donation and every expense—whether pertaining to political ads or to payroll or to employee dental insurance. Such wall-to-wall disclosure laws are constitutional (if at all) only when limited to groups whose major purpose is electoral. For its part, the State insists that its laws "cannot be construed" to embody any such limit. Dist. Ct. Doc. 28, at 2. In this way, the laws appear to conflict with First Amendment precedent, and the preliminary injunction should be affirmed.

# ARGUMENT

## I. When a federal claim can readily be brought in an indisputably pre-enforcement posture, the concerns animating *Younger* abstention are implicated only marginally at most.

As appellees' brief ably demonstrates, the district court acted within its discretion in denying the State's bid for *Younger* abstention. Behind the parties' arguments, however, is a more fundamental point: with First Amendment challenges to state laws now overwhelmingly brought in pre-enforcement actions, the concerns that animated *Younger* in 1971 no longer have real-world application in cases like this one. Countless pre-enforcement plaintiffs could raise the same claim appellees have raised here. They could proceed in federal court. And they could secure a victory that promises the same practical consequence as a victory here: shutting down enforcement statewide. Realistically, then, it's unclear what discernible values *Younger* advances in a case like this one. If a claim can just as easily be brought in an indisputably pre-enforcement posture by other plaintiffs, the State's skirmishing about abstention furthers none of *Younger*'s comity-based rationales in any material way. At the same time, abstention would visit real, concrete harms on appellees and their (substantial) First Amendment rights. It's all cost, no benefit. For this reason, too, the district court's exercise of jurisdiction should be affirmed.

A. **Appellees' First Amendment claim could be presented in an incontrovertibly pre-enforcement posture that would yield the same results as a plaintiff-side judgment here.**

1. In harnessing *Younger*, the State contends that this action poses an intolerable risk of "disrupt[ing]" state-level enforcement efforts, such that the district court had no option but to relinquish its jurisdiction. Appellants' Br. 31; *see also* Appellants' Br. 30. As a matter of blackletter law, appellees persuasively cite the waiver and timing problems with the State's position. Appellees' Br. 14-26. More broadly, the State's concerns with "disrupt[ion]" and "interference" are starkly anachronistic in a case like this one. Appellants' Br. 30, 31. *Younger* was written before pre-enforcement lawsuits became the dominant mode for challenging state laws on free-speech grounds. And the practical consequence of an indisputably pre-enforcement lawsuit challenging Georgia's disclosure laws would be much the same as a judgment for appellees here.

Game it out. Any one of hundreds of advocacy groups could sue the state defendants tomorrow. That lawsuit would be in an incontestably pre-enforcement posture; under precedent developed since *Younger*, Article III is at its most permissive in First Amendment cases, and "an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging" Georgia's law. *Susan B. Anthony List* v. *Driehaus*, 573 U.S. 149, 158 (2014); *see*

*also Speech First, Inc.* v. *Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022). In fact, disclosure laws like Georgia's are challenged routinely in clear-cut pre-enforcement suits. *See, e.g.*, Appellants' Br. 41-55 (relying almost entirely on pre-enforcement cases for merits arguments).

So there is a phonebook's worth of groups that have standing right now to sue the defendants over the same laws at issue here. *Younger* would not apply. *Steffel* v. *Thompson*, 415 U.S. 452, 462 (1974). And a plaintiff-side victory in any one of those suits would almost certainly spur Georgia's Government Transparency and Campaign Finance Commission to drop its enforcement action against New Georgia Project and anyone else facing similar proceedings. That is because federal rulings in pre-enforcement lawsuits have real effects on the government's dealings, not just with the specific plaintiff, but with *everyone* who is or will be targeted by the challenged law.[2] The

---

[2] *E.g.*, Maxine Bernstein, *State board halts inquiry into Allen Alley's use of word 'engineer,' places investigator on leave*, The Oregonian (Jan. 9, 2019) (reporting that state agency swiftly disciplined a staff member who continued enforcing a statute held unconstitutional by a federal court days earlier), https://tinyurl.com/47wfhwve; *Wis. Right to Life, Inc.* v. *Schober*, 366 F.3d 485, 490 (7th Cir. 2004) (noting that although earlier federal judgment "does not automatically stop state officials from trying to enforce the statute" against groups other than the original plaintiff, the government had disavowed its power to enforce the statute against anyone).

federal judgment may apply explicitly to all current and future targets of the law.[3] In some circuits, non-mutual preclusion may make the judgment enforceable against the government by non-parties.[4] And even when a judgment does not protect non-parties directly, the precedential force of the federal court's opinion has much the same practical effect. A circuit-court decision holding a state statute invalid, for instance, exerts enormous pressure on state actors to stop enforcement immediately—not just against the prevailing federal plaintiff, but against everyone. Continuing to enforce the statute against anyone invites follow-on Section 1983 actions. Those follow-on actions are all but guaranteed to prevail.[5] They expose the government defendants to substantial

---

[3] *E.g.*, *Rodgers* v. *Bryant*, 942 F.3d 451, 457-60 (8th Cir. 2019) (affirming order preliminarily enjoining enforcement of anti-loitering statute statewide).

[4] Note, *Nonmutual Issue Preclusion Against States*, 109 Harv. L. Rev. 792, 793 (1996) ("[L]ower courts have split over the use of nonmutual issue preclusion against state governments."); *Hercules Carriers, Inc.* v. *Fla. Dep't of Transp.*, 768 F.2d 1558, 1579 (11th Cir. 1985) ("We hold that the rationale outlined by the Supreme Court in [*United States* v. *Mendoza*, 464 U.S. 154 (1984)] for not applying nonmutual collateral estoppel against the government is equally applicable to state governments.").

[5] Howard M. Wasserman, *Precedent, Non-Universal Injunctions, and Judicial Departmentalism: A Model of Constitutional Adjudication*, 23 Lewis & Clark L. Rev. 1077, 1125 (2020) ("The obvious explanation for executive voluntary compliance is the inevitability of judicial loss in any new enforcement effort.").

attorneys' fees.[6] Anyone in an ongoing enforcement proceeding could likely sue to enjoin it in federal court.[7] Officials would even face damages liability if they were to persist in their enforcement efforts.[8]

2. Given these realities of modern pre-enforcement litigation, *Younger* is effectively deadweight in cases that could readily be brought by

---

[6] *Coal. for Secular Gov't* v. *Gessler*, 71 F. Supp. 3d 1176, 1178 (D. Colo. 2014) (castigating state's defiance of precedent and voicing intent to "award [a later plaintiff] its attorney fees under 42 U.S.C. § 1988 and advise state lawmakers that the Secretary will be on the hook for fees every time a group . . . has to sue to vindicate its First Amendment rights"), *aff'd*, 815 F.3d 1267 (10th Cir. 2016); Matthew Strugar (@MatthewStrugar), Twitter (Apr. 10, 2023) ("[J]ust a point about states defending dumb laws for show. i've challenged four states who tried to make people with pre-Lawrence-v-Texas conviction for having oral or anal sex register as sex offenders today. those states have been ordered to pay more than $849,000 in fees."), https://tinyurl.com/3y7v9j9v.

[7] *E.g.*, *Mulholland* v. *Marion Cnty. Election Bd.*, 746 F.3d 811, 819 (7th Cir. 2014) (holding that *Younger* could not prevent follow-on plaintiff's suit to enjoin county board's "attempt to enforce a law that a federal court has already told the Board in a final judgment is unconstitutional"); *see also* Wasserman, *supra*, at 1131-32.

[8] *Mulholland*, 746 F.3d at 819 n.1 ("If Board members or their agents were to try to enforce the anti-slating statute against other parties at this point, . . . we expect that this opinion and the *Ogden* judgment would make it difficult to invoke the defense of qualified immunity . . . ."); *cf. Snider* v. *City of Cape Girardeau*, 752 F.3d 1149, 1155-57 (8th Cir. 2014) (denying qualified immunity to police officer who enforced flag-desecration statute despite Supreme Court precedent clearly establishing that such statutes violate the First Amendment); *see generally Dickinson* v. *Cochran*, 833 F. App'x 268, 274-75 (11th Cir. 2020) (per curiam) (relying on Circuit's precedent to deny qualified immunity).

different plaintiffs in an incontrovertibly pre-enforcement posture. In these circumstances, the doctrine does little to safeguard "the notion of 'comity'" or "a proper respect for state functions" or "Our Federalism." *Younger*, 401 U.S. 37, 44 (1971). At most, it buys the government a little more time to violate more people's rights before a federal court intervenes.

At the same time, the costs of abstention are profound in a case like this one. Appellees are the speakers with the *most* concrete and *most* immediate injury in need of federal-court redress. Yet the State seeks to relegate them—and them alone—to raising their (substantial) First Amendment claims on the back foot, as state-court respondents. Whatever the outcome of those state-level proceedings, that process magnifies the First Amendment harms considerably. For "[t]he chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure." *Dombrowski* v. *Pfister*, 380 U.S. 479, 487 (1965). Compounding the injury, state-court proceedings often are protracted—with months spent in administrative courts that, as in Georgia, "generally cannot rule on constitutional claims." *Cobb Hosp., Inc.* v. *Dep't of Cmty. Health*, 837 S.E.2d 371, 373 (Ga. 2019); *cf. Elrod* v. *Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) ("The loss of First Amendment freedoms, for even minimal

periods of time, unquestionably constitutes irreparable injury."). Simply, *Younger* abstention comes with real costs. And where—as here—there appear to be no counterbalancing benefits, that mismatch strongly favors the federal courts' exercising jurisdiction.

**B. Because *Younger* is a judge-made doctrine claiming its footing in equity, the federal courts can validly take account of the fact that *Younger* serves little purpose in a case like this one.**

1. One response to our views on *Younger* would be to say they are in tension with U.S. Supreme Court precedent. *Younger* itself involved a First Amendment challenge to a state law that, were it to exist today, could likely be contested in a pre-enforcement suit. When the Court issued *Younger* in 1971, however, it could not have foreseen the dominance or practical effects of pre-enforcement First Amendment actions in decades to come. Writing in 1974, for instance, Justice Stewart predicted confidently that pre-enforcement suits would remain "exceedingly rare." *Steffel*, 415 U.S. at 476 (concurring opinion); *see also id.* at 462 (majority opinion) (holding that *Younger* does not apply to pre-enforcement actions).

That forecast proved inaccurate. Within a decade, the Court's precedent "marked a shift in anticipatory challenge jurisprudence that broadened plain-tiffs' ability to establish standing"—particularly for First Amendment claims.

*See* Amanda Mariam McDowell, Note, *The Impact of* Clapper v. Amnesty International USA *on the Doctrine of Fear-Based Standing*, 49 Ga. L. Rev. 247, 276 (2014).[9] A half-century later, First Amendment litigation now routinely comes to the federal courts as pre-enforcement challenges—with all the effects on state-level enforcement detailed above.

2.     The Supreme Court's affinity for *Younger* has evolved as well. A go-to doctrine in the 70's, *Younger* "has become disfavored in recent Supreme Court decisions." *Walker* v. *City of Calhoun*, 901 F.3d 1245, 1254 (11th Cir. 2018) (O'Scannlain, J.). It has been over 30 years since the Court last used *Younger* to displace federal jurisdiction. *Pennzoil Co.* v. *Texaco, Inc.*, 481 U.S. 1 (1987). And the one time this century the Court has addressed *Younger*, it did so to "stress[]" that "[c]ircumstances fitting within the *Younger* doctrine . . . are 'exceptional.'" *Sprint Commc'ns, Inc.* v. *Jacobs*, 571 U.S. 69, 73 (2013). Since then, "the message that abstention is the 'exception, not the rule,' has reverberated in the lower courts." Anne Rachel Traum, *Distributed*

---

[9] *See also* Michael L. Wells et al., Cases and Materials on Federal Courts 501 (4th ed. 2007) ("[L]ater cases indicate that the ability to maintain an anticipatory challenge to an allegedly unconstitutional provision prior to prosecution may be somewhat easier than either Stewart's *Steffel* concurrence or *Younger* would otherwise suggest."); Note, *Developments in the Law: Section 1983 and Federalism*, 90 Harv. L. Rev. 1133, 1297 (1977) (observing that "recent cases have taken a broader view" of the availability of pre-enforcement relief).

*Federalism: The Transformation of* Younger, 106 Cornell L. Rev. 1759, 1787

(2021). Today, *Younger* is used most often to rebuff claims by *pro se* detainees

who file premature habeas petitions or who believe arresting officers violated

their rights.

Against this backdrop, it is entirely proper for the federal courts to ac-

count for the modern reality that abstaining does little (if anything) to materi-

ally further *Younger*'s rationales in cases like this one. At base, *Younger* is a

judge-made doctrine that claims its footing in "equity jurisprudence." *Sprint*

*Commc'ns, Inc.*, 571 U.S. at 77 (quoting *Younger*, 401 U.S. at 43). And as the

Supreme Court most recently admonished, "[o]nly exceptional circumstances"

can "justify a federal court's refusal to decide a case in deference to the

States." *Id.* at 78 (citation omitted). A case like this one—where abstention

would further *Younger*'s values only marginally, at best—is hardly "excep-

tional." Certainly it is not exceptional enough to have *required* the district

court to surrender its jurisdiction. *Cf. Younger*, 401 U.S. at 44 ("[Federalism]

does not mean blind deference to 'States' Rights' any more than it means cen-

tralization of control over every important issue in our National Government

and its courts."). If the State elects to continue pressing the issue on this ap-

peal, *see Brown* v. *Hotel & Rest. Emps., Int'l Union Local 54*, 468 U.S. 491,

500 n.9 (1984) (noting that government lawyers may waive *Younger*), the district court's exercise of jurisdiction should be affirmed.

## II. Georgia's characterization of its campaign-finance laws in this case cannot be squared with the compliance requirements it imposes in the real world.

On the merits, Georgia's regulation of ballot committees and independent committees almost certainly violates the First Amendment. The State's main defense is to try to rewrite its law on the fly—and in ways that conflict directly with how it enforces that law statewide. The district court was thus correct to conclude that appellees showed a likelihood of success on the merits.

### A. In practice, Georgia's campaign-finance laws require that committees report every dollar received and every dollar spent.

1. The State appears to agree that it cannot validly require an independent group to disclose "*all* of their spending" unless the group's "major purpose" is electoral advocacy. Appellants' Br. 27; *see generally Buckley* v. *Valeo*, 424 U.S. 1, 79 (1976) (per curiam). Georgia's law, however, demands just that result. An entity triggers regulation as a ballot committee if it spends just $500 a year on ballot advocacy—even if it spends $1,000,000 on non-electoral activities during that same period. *See* Ga. Code §§ 21-5-3(2), 21-5-34(a)(2)(A). Similarly, an entity spending *any* money advocating for or against candidates is an "independent committee"—no matter how much it may spend

on other, non-electoral pursuits. *Id.* § 21-5-3(15); *see also* Ga. State Ethics Comm'n Adv. Op. 2008-04, at 1 (Aug. 28, 2008) ("[R]egardless of how little they receive or spend, [independent committees] are not exempt from the registration and reporting requirements."); Dist. Ct. Doc. 31, at 2 (noting that New Georgia Project's "major purpose 'is not the nomination or election of candidates, but rather voter registration and civic engagement'"). Simply—and as the State argued below—Georgia's "definitions of 'campaign committee' or 'independent committee' cannot be construed to provide for a statutory 'major purpose' limitation." Dist. Ct. Doc. 28, at 2. For groups that weigh in even minimally on Georgia politics, the State subjects them to one-size-fits-all regulation as full-blown independent committees or ballot committees.

2.    The State suggests that its law is nonetheless valid because it requires committees to disclose, not *all* their finances, but only "their expenditures and contributions for express advocacy." Appellants' Br. 60. (Express advocacy means ads that explicitly urge the success or defeat of a candidate or ballot measure. *See Buckley*, 424 U.S. at 44 & n.52; Ga. State Ethics Comm'n Adv. Op. 2010-05 (Apr. 5, 2011).) In this way, the State posits, its law does not demand wholesale reporting of all income and outlay. Instead, it requires

disclosure only of the specific receipts and spending that are meant to further the committee's express political advocacy.

That characterization conflicts with the State's position in every forum except this one. Everywhere else, the State makes clear that ballot-committee and independent-committee status carries with it the duty to report *all* income and *all* spending—whether or not the transactions have anything to do with "express advocacy." As appellees note, for example, the State's complaint against them lists hundreds of expenses as unreported "expenditures," many of which cannot possibly be attributed to express advocacy. Appellees' Br. 4, 52. The complaint also lists dozens of people as having made unreported "contributions"—without any evident basis for knowing whether any donor intended to fund political ads. Appellees' Br. 53; Dist. Ct. Doc. 22-6, at 63-65, 108-09. When enforcing its law—rather than defending it—the State is clear: every dime in and every dime out must be reported.

Practically speaking, moreover, that level of comprehensive reporting is the only way to fill out the State's campaign-finance forms accurately. The forms require committees to report "[t]otal contributions to date" and "[t]otal expenditures to date" and balance those figures to yield a final "Net Balance On Hand" for each reporting period. That balance must then be carried over

to the next period's report. And so on. *See, e.g.*, Campaign Contribution Disclosure Report at 2, "Better Savannah" (Independent Comm.) (Jan. 2, 2022), https://tinyurl.com/ycku9myb. Only when a committee can report a "zero balance" may it terminate and stop filing reports. Ga. Comp. R. & Regs. 189-4-.01(4). Given the mechanics of this system, the State is thus wrong to suggest that committees could perform "a fact-specific inquiry" into each of their "particular donation[s]" and "particular expense[s]" and report only those transactions specifically attributed to express advocacy. Dist. Ct. Doc. 28, at 11 (floating the idea for the first time in a supplemental brief). Such an approach would yield hopelessly inaccurate reports—with balances either misleadingly high, misleadingly low, or even negative. Only by recording all receipts and all spending—ad-related or not—can committees comply with Georgia's law.

**B.** **Because Georgia's comprehensive reporting scheme applies to groups whose "major purpose" is not electoral, it likely violates the First Amendment.**

1.      As enforced, Georgia's disclosure law almost certainly violates the First Amendment. A clear line in campaign-finance precedent is this: when it comes to independent groups, governments can require wholesale financial disclosure *only* for groups whose activities are wholly electoral (or nearly so).

In campaign-finance jargon, comprehensive reporting can be demanded only of groups whose "major purpose" is electoral. *Buckley*, 424 U.S. at 79.

It comes down to First Amendment tailoring. For independent electoral speech, the state interests justifying mandatory disclosure extend only so far as disclosure "helps voters to define more of the candidates' constituencies." *Id.* at 81; *see also Worley* v. *Fla. Sec'y of State*, 717 F.3d 1238, 1249 (11th Cir. 2013) (holding similarly as to ballot measures). And if a group's electoral advocacy makes up only a modest part of its overall activities, requiring it to report *all* of its revenue and spending is not tailored to the government's interests. In fact, that sort of data dump might actively "mislead voters as to who really supports the [group's] communications." *Van Hollen* v. *FEC*, 811 F.3d 486, 497 (D.C. Cir. 2016). Only for groups whose "major purpose" is electoral can the government require wholesale disclosure, on the theory that all (or most) of those groups' activities "are, by definition, campaign related." *Buckley*, 424 U.S. at 79; *cf. McCutcheon* v. *FEC*, 572 U.S. 185, 218 (2014) (plurality opinion) ("In the First Amendment context, fit matters.").

The State appears not to dispute these propositions. As discussed, for example, it appears to accept that it cannot validly require a group to disclose "*all* of their spending" unless the group's "major purpose" is electoral.

Appellants' Br. 27; *see also* Appellants' Br. 51-52 (discussing *Buckley*). Yet Georgia's disclosure laws break with that rule at a bedrock level. As detailed above and in appellees' brief (at 52-53), Georgia *does* require ballot committees and independent committees to report all their spending—ad-related or not. It *does* require them to report all their receipts—ad-related or not. And, for that matter, all their investments and all their debt. Ga. Code § 21-5-34(b)(1)(F), (G). And it does so whether or not express advocacy makes up *all* of a group's work or 50 percent or 0.05 percent. *See, e.g.*, Dist. Ct. Doc. 28, at 2 (insisting that the law "cannot be construed to provide for a statutory 'major purpose' limitation"). That one-size-fits-all approach cannot be squared with the First Amendment. And beyond rewriting its laws in its legal briefs, the State offers no argument to the contrary. The district court was correct to hold that the law likely violates appellees' First Amendment rights.

2.    The logic of the district court's decision does not foreclose the Georgia legislature from passing a different, more tailored disclosure law for groups who spend money on political ads but whose "major purpose" is not electoral. At the federal level, for example, Congress requires comprehensive financial reporting by "major purpose" entities (called political committees). Political speakers who lack that major purpose are not subject to those same

requirements. But they are not exempt from disclosure laws altogether; rather, they are subject to more modest requirements that require disclosure, not of everything, but of only those donations or spending for their political ads. *See Van Hollen*, 811 F.3d at 481-91 (explaining the law in understandable terms); *see also Citizens United* v. *FEC*, 558 U.S. 310, 366-72 (2010) (upholding the federal law as constitutional); *Wis. Right to Life, Inc.* v. *Barland*, 751 F.3d 804, 841 (7th Cir. 2014) ("A simpler, less burdensome disclosure rule for occasional express-advocacy spending by 'nonmajor-purpose groups' would be constitutionally permissible under *Citizens United* . . . .").

Georgia's law is different. It is far more onerous. It requires ongoing, comprehensive reporting of all revenue and outlay. And as the complaint against appellees spotlights, regulators stand ready to enforce it to an extent that even the Attorney General's Office appears reluctant to defend. The district court concluded correctly that the law is unsound.

## CONCLUSION

The preliminary injunction should be affirmed.

Dated: May 15, 2023.                    Respectfully submitted,

                                        /s/ Anna J. Goodman
                                        Samuel B. Gedge
                                        Anna J. Goodman
                                        INSTITUTE FOR JUSTICE
                                         901 N. Glebe Road, Suite 900
                                         Arlington, VA 22203
                                         (703) 682-9320
                                         sgedge@ij.org
                                         agoodman@ij.org

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this brief contains 4,451 words.

I hereby certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Expanded font.

Dated: May 15, 2023.

/s/ Anna J. Goodman
Anna J. Goodman
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
agoodman@ij.org