[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-14302

_____

NEW GEORGIA PROJECT, INC.,
NEW GEORGIA PROJECT ACTION FUND, INC.,

Plaintiffs-Appellees,

*versus*

ATTORNEY GENERAL, STATE OF GEORGIA,
CHAIRMAN OF GEORGIA GOVERNMENT TRANSPARENCY
AND CAMPAIGN FINANCE COMMISSION,
VICE CHAIR OF THE GEORGIA GOVERNMENT TRANSPAR-
ENCY AND CAMPAIGN FINANCE COMMISSION,
DARRYL HICKS,
in his official capacity as a member of the Georgia
Government Transparency and Campaign Finance
Commission
DAVID BURGE,
in his official capacity as a member of the Georgia

2                    Opinion of the Court                22-14302

Government Transparency and Campaign Finance
Commission, et al.,

                                        Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:22-cv-03533-VMC

_____

Before ROSENBAUM, NEWSOM, and MARCUS, Circuit Judges.

NEWSOM, Circuit Judge:

In this appeal from the grant of a preliminary injunction, we are asked to decide whether two Georgia campaign-finance statutes violate the First Amendment and, as a threshold matter, whether the district court should have abstained from exercising its jurisdiction under *Younger v. Harris*, 401 U.S. 37 (1971).

After careful review, and with the benefit of oral argument, we hold that *Younger* and its progeny required the district court to abstain and that the court therefore erred in issuing injunctive relief. Accordingly, we needn't reach the merits of the First Amendment challenge. We vacate the district court's decision and remand with instructions that it dismiss the underlying action.

# I

## A

New Georgia Project is a § 501(c)(3) tax-exempt nonprofit founded by former state representative and gubernatorial candidate Stacey Abrams. Its mission "is to build power with and increase the civic participation of . . . Black, Latinx, AAPI, and young Georgians . . . and other historically marginalized communities" through "voter registration, organizing, and advocacy." New Georgia Project Action Fund is a § 501(c)(4) tax-exempt nonprofit whose purpose, it says, is "not the nomination or election of candidates, but rather engagement in issue advocacy." We'll refer to these two entities together as "New Georgia."

The Georgia Government Transparency and Campaign Finance Act requires individuals and entities that spend more than a specified amount on express advocacy in favor of or in opposition to a particular candidate or ballot measure to disclose those expenditures and their sources. *See* O.C.G.A. § 21-5-3(2), (15); *id.* § 21-5-34(a), (f). The Act also requires "campaign committees" and "independent committees" to register with the Georgia Government Transparency and Campaign Finance Commission. *Id.* § 21-5-34(a), (f). Under the Act, there are different types of "campaign committees," one of which exists to urge the adoption or rejection of ballot measures and which we'll call a "ballot committee." *Id.* § 21-5-34(a). An "independent committee" is any entity other than a "campaign committee, political party, or political action

committee" that receives donations and spends money to advocate for the election or defeat of a candidate.  *Id.* § 21-5-3(15).

New Georgia never registered with the Commission, nor did it did file disclosure reports during the 2018 or 2019 campaign seasons.

## B

In September 2019, a Commission staff attorney filed formal complaints with the Commission alleging that New Georgia had engaged in significant election spending in 2018 and 2019 without registering or filing the required disclosures.  The complaints asserted that the money New Georgia spent advocating on behalf of candidates qualified it as an "independent committee" within the meaning of the Act and that the money it spent to support a transit-expansion ballot measure qualified it as a "ballot committee."

The Commission initiated an investigation.  It subpoenaed New Georgia's bank records, campaign materials, and invoices in an effort to determine whether the organization had engaged in undisclosed election spending.  New Georgia filed a motion to quash the subpoena, which the Commission denied.  The Commission then subpoenaed Wells Fargo to obtain New Georgia's bank records.  New Georgia moved a Georgia state court to quash that subpoena too, but that motion was also denied.

Based on information discovered through the subpoenas, a staff attorney filed an amended complaint with the Commission.  It alleged that New Georgia had violated the Act by failing to disclose more than $4.2 million in contributions and $3.2 million in

expenditures during the 2018 primary, general, and run-off elections. It also alleged that New Georgia had violated the Act by failing to disclose $646,422 in contributions and $173,643 in expenditures to support a transit-related ballot initiative. The Commission notified New Georgia that it would hold a preliminary hearing at which it could contest the charges.

The following chronology is important: The preliminary hearing before the Commission occurred on August 1, 2022. Three days later, on August 4, the Commission issued an order finding "reasonable grounds" to conclude that New Georgia had violated the Act and referring the case to the Georgia Attorney General's office for further proceedings.

About four weeks later, on August 31, New Georgia filed a civil-rights action in federal district court against the Georgia Attorney General and the members of the Commission—collectively, "the state"—claiming that the Act violated the First and Fourteenth Amendments, both on its face and as applied. A little more than a week thereafter, on September 8, New Georgia moved the district court to issue a preliminary injunction preventing the state from enforcing the Act against it. Citing *Buckley v. Valeo,* 424 U.S. 1 (1976), New Georgia contended that the Act's disclosure requirements couldn't constitutionally be applied to it because its "major purpose" wasn't nominating or electing a candidate. *Id.* at 79. New Georgia also argued that the Act swept too broadly by regulating all expenditures made "for the purpose of influencing" a

nomination or election, even in the absence of "express advocacy." *Id*. at 23, 48; O.C.G.A. § 21-5-3(7), (12).

Meanwhile, back in the state proceeding, about two weeks later, on September 21, the Georgia Attorney General formally transferring the enforcement action to the Office of State Administrative Hearings ("OSAH") for an evidentiary hearing.

Several months passed, and in December the federal court issued an order preliminarily enjoining enforcement of the Act against New Georgia. In so doing, the district court rejected the state's arguments (1) that under *Younger v. Harris*, 401 U.S. 37 (1971), the court should abstain from exercising its jurisdiction on the ground that the state's ongoing enforcement action provided New Georgia an adequate opportunity to vindicate its First Amendment rights and (2) that, on the merits, preliminary injunctive relief was inappropriate. The court noted that there was no dispute that the Commission's prosecution of New Georgia qualified as the sort of a civil-enforcement proceeding to which *Younger* abstention might apply. But, the court concluded, the state's action wasn't "ongoing" in a way that would trigger *Younger*'s application until the matter was formally transferred to OSAH on September 21, 2022. Because by that time—and we'll get into the details in due course—New Georgia's federal suit had been pending for several weeks, the district court held that *Younger* and its progeny didn't require abstention.

Having determined that it didn't have to abstain, the district court proceeded to hold that the Act's ballot- and independent-

committee provisions were facially invalid under the First Amendment. In particular, although the court recognized that the state had important interests in promoting transparency and ensuring that voters have necessary information, and that the Act's disclosure requirements were substantially related to those interests, it held that those requirements weren't sufficiently tailored and swept too broadly. After finding that the usual equitable factors weighed in New Georgia's favor, the court enjoined the enforcement of the challenged provisions.

This is the state's appeal.

## II

Before us, the state contends, as a threshold matter, that the district court abused its discretion in declining to abstain under *Younger* from exercising its jurisdiction to issue injunctive relief. *See Walker v. City of Calhoun,* 901 F.3d 1245, 1255 (11th Cir. 2018) (holding that a district court's *Younger* abstention decision is reviewed for abuse of discretion). For reasons we'll explain, we agree that *Younger* and its progeny required the district court to abstain. Accordingly, we will vacate and remand on that ground, without addressing the merits of New Georgia's First Amendment challenge.

## A

More than 200 years ago now, Chief Justice Marshall explained that federal courts "have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given"—either, he warned, would be "treason to the constitution." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821). And in the

years since, the Supreme Court has "often acknowledged that federal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress," *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996), and has repeatedly reiterated that federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them," *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817 (1976).

To be sure, in more recent times the Court has acknowledged that a federal court's duty to decide the cases that fall within its jurisdiction "is not . . . absolute." *Quackenbush*, 517 U.S. at 716. Even so, it remains the case that abstaining from the "exercise of federal jurisdiction is the exception, not the rule." *Colorado River*, 424 U.S. at 813. Accordingly, we have said that only the "clearest of justifications merits abstention." *Jackson-Platts v. Gen. Elec. Cap. Corp.,* 727 F.3d 1127, 1140 (11th Cir. 2013) (quotation marks omitted).

In *Younger*, the Supreme Court recognized a limited exception to the usual rule. There, an individual who had been indicted under a state "syndicalism" law sued in federal district court, seeking an order enjoining his state prosecution on the ground that it violated and chilled his First Amendment "rights of free speech and press." 401 U.S. at 38–39. The district court granted the injunction, but the Supreme Court reversed, citing principles of equity and comity and what it called a "national policy forbidding federal courts to stay or enjoin pending state court proceedings except under special circumstances." *Id*. at 41, 44. In its inception, *Younger*

"abstention" applied only very narrowly—namely, to requests to enjoin (1) state criminal prosecutions and (2) indeed, only to those prosecutions that were "pending in state courts at the time the federal proceeding is begun." *Id*. at 41. With respect to other circumstances—to non-criminal proceedings, or to those not yet pending—the *Younger* Court "express[ed] no view." *Id*.

Just a few years later, the Supreme Court declined to extend *Younger*'s abstention policy to threatened-but-not-yet-filed prosecutions. In *Steffel v. Thompson*, the Court observed that the "principles of equity, comity, and federalism" that had animated its decision in *Younger* "have little force in the absence of a pending state proceeding." 415 U.S. 452, 462 (1974) (citation omitted). The *Steffel* Court continued:

> When no state criminal proceeding is pending at the time the federal complaint is filed, federal intervention does not result in duplicative legal proceedings or disruption of the state criminal justice system; nor can federal intervention, in that circumstance, be interpreted as reflecting negatively upon the state court's ability to enforce constitutional principles. In addition, while a pending state prosecution provides the federal plaintiff with a concrete opportunity to vindicate his constitutional rights, a refusal on the part of the federal courts to intervene when no state proceeding is pending may place the hapless plaintiff between the Scylla of intentionally flouting state law and the Charybdis of forgoing what he believes to be

constitutionally protected activity in order to avoid becoming enmeshed in a criminal proceeding.

*Id.*

For better or worse, the Supreme Court has since broadened *Younger*'s reach in two significant ways, both of which bear directly on this case. First, it has extended *Younger* beyond criminal prosecutions to apply to state civil-enforcement proceedings. Initially, in *Huffman v. Pursue, Ltd.*, the Court held that the policies underlying *Younger*—and thus its anti-injunction policy—apply to state-brought civil actions that are "akin to . . . criminal prosecution[s]" and "in aid of and closely related to criminal statutes." 420 U.S. 592, 604 (1975). Then, in *Trainor v. Hernandez*, the Court took the next step, holding that "the principles of *Younger* and *Huffman* are broad enough to apply" to *all* state-filed civil-enforcement proceedings "brought to vindicate important state policies," even those that cannot fairly be characterized as "quasi-criminal." 431 U.S. 434, 444 (1977).

No one seems to dispute that the state campaign-finance proceeding at issue here qualifies as the type of civil-enforcement action to which *Younger* abstention *can* apply. To determine whether *Younger*'s rule *actually* applies, we look to the factors that the Supreme Court outlined in *Middlesex County Ethics Committee v. Garden State Bar Association*—namely, (1) whether there is an "ongoing state judicial proceeding"; (2) whether the state proceeding "implicate[s] important state interests"; and (3) whether there is "an adequate opportunity in the state proceeding[] to raise

constitutional challenges." 457 U.S. 423, 432 (1982). All here seem to agree, and we have no reason to doubt, that the second and third *Middlesex* factors are satisfied, so we turn to the first: Was the state campaign-finance proceeding here "ongoing" in the relevant sense?

Which brings us to the second significant way in which the Supreme Court has extended *Younger*. A state proceeding, the Court has held, can be "ongoing" in either of two circumstances. First, and most obviously, a state action is "ongoing" if it's actually pending on the day the federal suit is filed. Second, and far less obviously, a state proceeding will be deemed to be "ongoing" for *Younger* purposes even if it's *not* actually pending when the federal suit is filed—provided that it's instituted soon thereafter, "before any proceedings of substance on the merits have taken place in federal court." *Hicks v. Miranda*, 422 U.S. 332, 349 (1975); *accord Tokyo Gwinnett, LLC v. Gwinnett County*, 940 F.3d 1254, 1268 (11th Cir. 2019); *For Your Eyes Alone, Inc. v. City of Columbus*, 281 F.3d 1209, 1217 (11th Cir. 2002).

The parties here vigorously dispute when the state campaign-finance proceeding against New Georgia commenced in earnest, and thus whether it was *actually* pending when New Georgia filed its federal suit on August 31, 2022. For its part, the state points to August 4, 2022, as the key date—that, recall, is the day the Commission issued its "reasonable grounds" order. That order, the state contends, is the functional equivalent of the indictment that formally commences a criminal proceeding.

New Georgia counters by asserting (1) that by failing to pursue it in the district court the state waived any argument that its enforcement action commenced so early and (2) that, in any event, under Georgia law the proceeding can't be deemed to have commenced until September 21, 2022, when the Attorney General formally transferred the matter to the OSAH. In support of the latter contention, New Georgia points to a Georgia statute that provides that "an action shall be deemed to have commenced" only, as relevant here, with the service of a "notice of summons or hearing" under the Georgia Administrative Procedure Act, which occurs only after a preliminary hearing. O.C.G.A. § 21-5-13(d).

We needn't decide whether the state's enforcement action against New Georgia was actually pending on August 31, when New Georgia filed suit in federal court. We can assume, as New Georgia insists, that the state proceeding didn't commence for another three weeks, until September 21, when the Attorney General transferred the case to OSAH. The question remains whether the state proceedings were nonetheless "ongoing" within the meaning of *Hicks*'s gloss—which, again, holds that "the principles of *Younger v. Harris* should apply in full force" even where state proceedings "are begun against the federal plaintiffs after the federal complaint is filed," provided that they are commenced "before any proceedings of substance on the merits have taken place in the federal court." *Hicks*, 422 U.S. at 349.

It is to that dispositive question that we now turn.

**B**

In determining whether *Hicks*'s "proceedings of substance on the merits" criterion is satisfied, we look to "the time that the district court has spent considering the case, any motions ruled on, any discovery, the number of conferences [or hearings] held, and any change in the parties' position as a result of the federal litigation." *Tokyo Gwinnett,* 940 F.3d at 1272 (alteration in original) (quotation marks omitted). For good measure, we'll also consider motions that the parties filed, even if the district court hadn't yet ruled on them. *See id.* (citing *For Your Eyes Alone*, 281 F.3d at 1218).

The district court engaged in only the most cursory treatment of these considerations. A closer look, we think, leads inexorably to the conclusion that no "proceedings of substance on the merits" had occurred in New Georgia's federal suit before the Attorney General formally transferred the state proceeding to OSAH on September 21, 2022. The only thing that the district court had done before that date was to admit New Georgia's attorneys pro hac vice and issue a routine standing order. And the only things that the parties had done were to file (1) a complaint, (2) pro hac vice applications and notices of appearance, (3) a motion for preliminary relief, and (4) service waivers. Whatever exactly the phrase "proceedings of substance on the merits" means, the proceedings that took place in federal court here were neither "substan[tive]" nor focused "on the merits" of New Georgia's First Amendment claim.

The decisions on which New Georgia relies—in which we held that abstention was not required—are readily distinguishable. In *Tokyo Gwinnett*, for instance, by the time the state filed its enforcement proceeding, the federal district court had, following nearly a year of docket activity, denied a motion to dismiss and entered a temporary restraining order. *See* 940 F.3d at 1268–69, 1272. So too in *For Your Eyes Alone*, where we held that a federal court didn't need to abstain because the city there had commenced its prosecution only "after it had begun *actively litigating* its position in federal court." 281 F.3d at 1218 (emphasis added). By the time the city initiated its action in state court there, it had already filed motions to dismiss and for summary judgment in federal court, and the district court had already held an evidentiary hearing and issued a TRO. *Id.* at 1218–19. Nothing of that sort had occurred before September 21 in federal court here.

Rather than meaningfully contending with the usual indicia—rulings, discovery, conferences, etc.—New Georgia offers four alternative arguments. *First*, echoing the district court, it recasts *Hicks*'s "proceedings of substance on the merits" criterion in purely temporal terms, as a measure of the time that elapses between the filing of a federal suit and the commencement of state proceedings. So, for instance, New Georgia emphasizes that in *Hicks*—in which the Supreme Court held that abstention was required—the state prosecution began the day after the federal suit commenced, *see* 422 U.S. at 338, whereas in *Tokyo Gwinnett*—in which we held that it wasn't—the county didn't institute an enforcement action until "nearly a year after" the plaintiff filed suit in

federal court, *see* 940 F.3d at 1270. This case, New Georgia argues, falls somewhere between *Hicks* and *Tokyo Gwinnett* because the state instituted its enforcement proceeding three weeks after the federal suit was filed. And because no binding precedent squarely addresses that in-between scenario, New Georgia says, we should defer to the district court's determination that, "in light of its experience managing cases, it is too late." Br. of Appellee at 25 (quoting Doc. 31 at 21).

We disagree. New Georgia has misread *Hicks* and its progeny. Those decisions focus not on the raw time that a federal case has spent on a district court's docket but, rather, on whether the court has meaningfully engaged the merits of the claims before it. *See, e.g.*, *For Your Eyes Alone*, 281 F.3d at 1218–19. To be sure, the district court has some discretion to make even that determination "in light of its experience managing cases." Here, though, it's clear beyond reasonable dispute that the court never addressed itself to the merits of New Georgia's First Amendment claim.

*Second*, New Georgia asserts that the First Amendment is just different—uniquely resistant to the principles of *Younger* and *Hicks*: "[T]his Court," New Georgia says, "has been particularly reluctant to order abstention based on post-filing events in cases . . . involving a facial or as-applied challenge to a state statute on First Amendment free speech grounds." Br. of Appellee at 23 (quotation marks omitted). And to be sure, we have recognized (albeit in dicta) that in the First Amendment context we can consider "the costs of duplication and delay caused by *Younger* as we

calibrate how broadly or narrowly to define proceedings of sub-
stance on the merits under *Hicks*." *For Your Eyes Alone*, 281 F.3d at
1219–20. Even so, we have clarified that "First Amendment con-
cerns do not, in themselves, provide a federal court with justifica-
tion for interfering with a pending state criminal proceeding." *Id.*
at 1219. And indeed, many of the decisions in which the Supreme
Court recognized and then expanded abstention doctrine—includ-
ing, most notably, *Younger* and *Hicks*—were First Amendment
cases. *See Younger*, 401 U.S. at 40; *Hicks*, 422 U.S. at 335–38; *see also,
e.g.*, *Middlesex*, 457 U.S. at 429; *Huffman*, 420 U.S. at 595.

*Third*, New Georgia contends that even if *Younger* applies,
we should nonetheless forge ahead on the ground that the chal-
lenged provision is "flagrantly and patently" unconstitutional.
*Younger*, 401 U.S. at 53–54. We disagree. The *Younger* Court itself
explained that to fit within that limited exception, a challenged pro-
vision must be unconstitutional "in every clause, sentence and par-
agraph, and in whatever manner and against whomever an effort
might be made to apply it." *Id.* (citation omitted); *see also For Your
Eyes Alone*, 281 F.3d at 1215. We, too, have emphasized the "nar-
rowness" of the flagrantly-and-patently-unconstitutional excep-
tion. *See Hughes v. Att'y Gen. of Fla.*, 377 F.3d 1258, 1263 n.8 (11th
Cir. 2004). Given the procedural posture, we "certainly cannot say
at this stage that this statute is flagrantly and patently" unconstitu-
tional in every application. *Kolski v. Watkins*, 544 F.2d 762, 755 (5th
Cir. 1977) (quotation marks and citation omitted). Not even the
district court went so far. It didn't hold, for instance, that New
Georgia had established that "no set of circumstances exists under

which the Act would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987); rather, in granting preliminary injunctive relief, the district court merely held that the Act was "overbroad." *Cf. Butler v. Alabama Jud. Inquiry Comm'n*¸ 245 F.3d 1257, 1265 (11th Cir. 2001) (declining to find the flagrantly-and-patently-unconstitutional exception satisfied where a provision was alleged to create a "chilling effect" on protected speech).

*Finally*, although it doesn't label it as such, New Georgia seems to suggest that this case fits within an exception to *Younger* that permits a federal court to exercise jurisdiction even in the face of an ongoing state proceeding if there is evidence that the state action was instituted in "bad faith." 401 U.S. at 53–54. In particular, New Georgia contends that the Attorney General's decision to transfer the state case to OSAH the day before filing its preliminary-injunction response in federal court bore the "hallmarks of an attempt to shore up [its] litigation position." Br. of Appellee at 6–7 (quoting Doc. 31 at 22). Abstaining here, New Georgia says, would "'risk creating an expansive *reverse removal power*,' giving state officials 'broad discretion to remove federal civil rights actions to state criminal court on a routine basis, even after the plaintiff had invested precious time and resources to bringing the federal litigation.'" *Id*. at 23 (quoting *For Your Eyes Alone*, 281 F.3d at 1219).

The procedural history here, we think, actually indicates the opposite. The Attorney General's transfer of the state civil-enforcement proceeding to OSAH didn't come out of left field, as one might expect of a bad-faith effort to scuttle a civil-rights plaintiff's

choice of a federal forum. To the contrary, the state had been investigating New Georgia for years and recommended enforcement weeks before New Georgia filed its federal suit. The evidence here gives rise to no compelling inference that the state was strategically seeking to evade federal-court jurisdiction; rather, the state seems simply to have been pursuing its enforcement action in the normal course, from investigation to prosecution.

*   *   *

In sum, we conclude that we are bound by existing precedent to conclude that the district court was required to abstain because no "proceedings of substance on the merits" had occurred in federal court before the state formally commenced its enforcement action.

**IV**

Because we hold that the district court abused its discretion by refusing to abstain here, we needn't address the merits of New Georgia's First Amendment challenge or the appropriateness of a preliminary injunction. Instead, we **VACATE** the district court's

decision and **REMAND** with instructions that it dismiss New Georgia's action.

**VACATED** and **REMANDED.**

ROSENBAUM, Circuit Judge, concurring:

*Younger* abstention has always had a First Amendment problem. *See Younger v. Harris*, 401 U.S. 37 (1971). And for more than fifty years, we have brushed off this problem—in part because principles of federalism weigh heavily in favor of abstention and in part because it was thought that the rights that litigants have asserted were insufficient to overcome that institutional concern.

But our conception of our First Amendment rights has changed dramatically since *Younger* issued. Indeed, we view few rights to be as critical as the right that New Georgia Project asserts here—the right to engage in political speech around an election.

*Younger*, too, has evolved. Today's decision makes clear that states may use *Younger*, purposely or inadvertently, to prevent those who seek to exercise their right to engage in core political speech from meaningfully doing so. It is time to reconsider just how far *Younger* abstention should extend.

## I.

At bottom, *Younger* abstention is a contest between two commitments: federal respect for state-court proceedings and federal protection of individual constitutional rights. The *Younger* decision resolves that tension against the constitutional right.

In *Younger*, four plaintiffs filed a federal lawsuit to enjoin California from enforcing its Criminal Syndicalism Act. *Younger*, 401 U.S. at 38–40 & n.1. The lead plaintiff, John Harris, had been charged with two violations of the law for distributing leaflets and

asked for the courts to enjoin the district attorney from prosecuting him on the ground that "the prosecution and even the presence of the Act inhibited him in the exercise of his rights of free speech and press." *Id*. at 39.  Three other plaintiffs intervened, with two plaintiffs arguing that Harris's prosecution inhibited their membership in the Progressive Labor Party and one plaintiff arguing that the prosecution "made him uncertain" that he could teach about Karl Marx or read the Communist Manifesto. *Id*. at 39–40.

*Younger* wasn't the first federal challenge involving California's Criminal Syndicalism Act.  In 1927, the Supreme Court had upheld the law's constitutionality when it reviewed the criminal conviction of Anita Whitney, a political organizer who had helped found the Communist Labor Party of America. *Whitney v. California*, 274 U.S. 357, 371–72 (1927), *overruled by Brandenburg v. Ohio*, 395 U.S. 444 (1969).  The Supreme Court ruled that Whitney's political activities constituted "a clear and present danger of substantive evil" and that the law was a valid use of the state's police power. *Id*. at 374 (Brandeis, J., concurring).  *Whitney* governed when Harris was indicted, when he challenged his indictment in the California state courts, when the state courts denied his petitions, and when he filed his federal lawsuit. *See Harris v. Younger*, 281 F. Supp. 507, 508–10, 516–17 (C.D. Cal. 1968), *rev'd*, 401 U.S. 37 (1971).  But by the time the Supreme Court heard *Younger*, it had formally overruled *Whitney* and held that the government cannot constitutionally punish this sort of abstract advocacy. *Brandenberg v. Ohio*, 395 U.S. 444, 448–49 (1969) (per curiam) (reversing the conviction of a Ku Klux Klan leader under Ohio's criminal syndicalism act).

Nevertheless, the Supreme Court tossed the suit. *Younger*, 401 U.S. at 53–54. The Court held that *Younger*'s three intervenor-plaintiffs couldn't maintain their challenge because their fear of criminal prosecution was "imaginary or speculative." *Id.* at 42. Stated simply, they came to federal court too soon. *See id.* But because Harris waited until after his indictment to sue, the Supreme Court determined that he was too late. *Id.* at 54. Issuing relief would require interfering with a state criminal prosecution, and principles of equity, comity, and federalism commanded non-interference, the Court reasoned. *Id.* at 50–54.

The Supreme Court also made clear its view that the right involved didn't justify federal intervention. *Id.* It explained that, for a federal court to step in, "the threat to the plaintiff's federally protected rights must be one that cannot be eliminated by his defense against a single criminal prosecution." *Id.* at 46. But Harris's injury was "solely 'that incidental to every criminal proceeding brought lawfully and in good faith.'" *Id.* at 47 (citation and internal quotation marks omitted). In characterizing Harris's injury in this way, the Supreme Court brushed off the "chilling effect" that criminal prosecutions usually have on First Amendment rights as an insufficient basis for interfering with state-criminal proceedings. *See id.* at 50–51.

## II.

The *Younger* decision involved only one corner of the First Amendment. *See Younger*, 401 U.S. at 50–53. But New Georgia Project's challenge concerns a markedly different space within the First

Amendment—the right to engage in political speech. But that's not all—it involves the right to engage in political speech *during an election*. And even though we have long recognized that "not all speech is of equal First Amendment importance," *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 56 (1988) (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758 (1985)), only recently have we demanded the highest form of protection for this sort of political speech, *see Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 349–50 (2010).

Historically, we afforded the government a wide berth in its regulation of political speech. For instance, we upheld restrictions on political speech because the government determined that this speech might interfere with its wartime powers. *See Schenck v. United States*, 249 U.S. 47, 52 (1919). We upheld restrictions on political speech because the government determined that this speech might undermine the military and national security. *See Debs v. United States*, 249 U.S. 211, 216 (1919). And we upheld restrictions on political speech because the government determined that this speech might disturb the public peace or otherwise promote subversion. *See Gitlow v. New York*, 268 U.S. 652, 667–68 (1925). In sum, our First Amendment jurisprudence traditionally accommodated the criminalization of political speech.

By the time that *Younger* came down, we understood that the First Amendment requires some level of judicial intervention against excessive government regulation. *See, e.g.*, *Cohen v. California*, 403 U.S. 15, 26 (1971) (holding an anti-military statement to be

protected speech). Indeed, less than a decade later, our jurisprudence began to reflect a recognition that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976) (citing *New York Times Co. v. United States*, 403 U.S. 713 (1971)).

Today, more than a half-century after *Younger*, we have flipped our traditional approach to political speech on its head. We now act with the understanding that political speech "is central to the meaning and purpose of the First Amendment." *Citizens United*, 558 U.S. at 329 (citing *Morse v. Frederick*, 551 U.S. 393, 403 (2007)). "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Id.* at 339. Because speech is essential to democracy, the Constitution guarantees the right to speak on "all matters of public concern without previous restraint or fear of subsequent punishment," *Fed. Election Comm'n v. Wis. Right To Life, Inc.*, 551 U.S. 449, 469 (2007) (quoting *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 776 (1978))—especially when that speech bears on an election, *Citizens United*, 558 U.S. at 334 (explaining that speech is essential "to the integrity of the election process").

Against this background, we opened up "breathing space" to accommodate more political speech. *NAACP v. Button*, 371 U.S. 415, 433 (1963). True, we continue to accept and uphold certain calculated regulations of political speech, including the "unique and

complex rules" that the government imposes on campaign contributions and expenditures. *Citizens United*, 558 U.S. at 334. But we weigh the need for these and other regulations carefully against the potential that those restrictions will chill speech altogether. *Cf. id.* ("A speaker's ability to engage in political speech that could have a chance of persuading voters is stifled if the speaker must first commence a protracted lawsuit.").

In all, political speech in the election context merits the strongest protection, *see, e.g.*, *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 608 (2021), and "must prevail against laws that would suppress it, whether by design or inadvertence," *Citizens United*, 558 U.S. at 340.

### III.

Despite our commitment elsewhere to protecting political speech, today's decision illustrates that *Younger* has evolved, by inadvertence, to suppress that speech. *Cf. id.* at 351 (explaining that corporations do not forfeit their First Amendment rights because states confer other advantages on them).

Let's begin, as *Younger* does, with the breadth of state enforcement actions that might trigger abstention. On *Younger*'s face, federal courts must defer to state proceedings under "exceptional circumstances." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans ("NOPSI")*, 491 U.S. 350, 368 (1989). *Younger* has strayed far from that ideal. Despite originating from a concern for federal respect for state criminal prosecutions, *Younger*, 401 U.S. at 53, the doctrine now applies to quasi-criminal state proceedings, *see*

*Huffman v. Pursue, Ltd.*, 420 U.S. 592, 594 (1975); state proceedings involving the enforcement of state-court orders and judgments, *see Pennzoil Co. v. Texaco Inc.*, 481 U.S. 1, 13–14 (1987); and quasi-judicial state administrative proceedings, *see Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619, 627 (1986). In short, so long as some state regulatory body initiates a proceeding that "declares and enforces liabilities," *NOPSI*, 491 U.S. at 370 (quoting *Prentis v. Atl. Coast Line Co.*, 211 U.S. 210, 226 (1908)), the state can prevent any regulated entity from seeking federal-court protection of its right to political speech.

Next, the *Younger* inquiry. *Younger* abstention, like all other abstention doctrines, arises from the "historic powers" that federal courts possess as "court[s] of equity" to decline to hear cases. *Fair Assessment in Real Estate Ass'n, Inc. v. McNary*, 454 U.S. 100, 120 (1981) (Brennan, J., concurring). *Younger* therefore got its start as a weighing of "the circumstances of the present case" against long-standing principles of equity, comity, and federalism. *Younger*, 401 U.S. at 49. But it has morphed into a mechanical rule that requires federal courts to abstain if three less-than-revealing conditions are met: the state proceeding (1) is "ongoing," (2) "implicate[s] important state interests," and (3) provides "an adequate opportunity . . . to raise constitutional challenges." *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982).

This checklist confines our discretionary authority to exercise or decline jurisdiction; so long as the state ensures that its enforcement proceeding satisfies the three *Middlesex* factors, federal

plaintiffs must go through state proceedings, administrative and judicial, before they can go to federal court. *See* Aaron R. Petty, *Matters in Abatement*, 11 J. App. Prac. & Process 137, 161 (2010). And as our decision today shows, in only the rarest of cases will the state leave a box unchecked.

The first *Middlesex* factor should present the strongest obstacle to abstention. *See Middlesex*, 457 U.S. at 432. As the majority explains, the state satisfies this factor if it begins its enforcement action "before any proceedings of substance on the merits have taken place in federal court." *Hicks v. Miranda*, 422 U.S. 332, 349 (1975). This means a state can block federal litigation by initiating an enforcement action and "removing" the case to a state forum. *See* Bryce M. Baird, Comment, *Federal Court Abstention in Civil Rights Cases: Chief Justice Rehnquist and the New Doctrine of Civil Rights Abstention*, 42 Buff. L. Rev. 501, 531 (1994). To avoid *Younger*, then, potential federal plaintiffs must file their complaints the moment they have a credible threat of enforcement and must litigate quickly before the state actually begins its enforcement action. *See KVUE, Inc. v. Moore*, 709 F.2d 922, 928 (5th Cir. 1983). And even if federal plaintiffs rush to file, federal courts, too, must rush to hold hearings, issue rulings, and conduct their business, whatever the cost, before the state enforcement authority steps in.

Plus, even if potential federal plaintiffs quickly file their action before enforcement action commences, they run the risk of being kicked out of federal court because the federal court deems their alleged enforcement threat too speculative. *See Younger*, 401

U.S. at 42. So hitting that Goldilocks sweet spot between too early and too late is nearly impossible for a potential federal plaintiff who wishes to challenge enforcement of a law against them.

Not only that, but a state authority will almost always satisfy the remaining *Middlesex* factors. The second *Middlesex* factor—that the state proceeding implicates important state interests—invariably weighs in favor of abstention. *See Middlesex*, 457 U.S. at 432. So far, we have determined that the state's interest is sufficiently important if it concerns crime, education, family relations, public health, property, and corporations. *See Harper v. Pub. Serv. Comm'n of W. Va.*, 396 F.3d 348, 352–53 (4th Cir. 2005). Indeed, it is hard to imagine what state interest is so insignificant that we "would disregard the comity between the States and the National Government," *Pennzoil Co.*, 481 U.S. at 11, for it and effectively rule that the state is engaged in unimportant business.

The third *Middlesex* factor—that the state proceeding provides an adequate opportunity to raise federal defenses—is similarly toothless. *See Middlesex*, 457 U.S. at 432. It is well established that state administrative proceedings satisfy this requirement even if federal plaintiffs must wait until after the administrative body issues an adverse decision to raise their defenses in a state-court appeal. *See Ohio Civil Rights Comm'n*, 477 U.S. at 629. In practice, this means that parties who want to vindicate their First Amendment right to speak may have to wait years before any institution considers that right.

Take New Georgia Project as an example.  It first asserted its First Amendment rights in 2019 when the Commission issued a subpoena for its financial records.  But neither the Commission nor the Georgia state courts considered the merits of New Georgia's First Amendment claim in the *three years* between that subpoena and the start of this suit.  And now we are forced to abstain under *Younger*.  So New Georgia Project must wait even longer before any institution considers its right to engage in core political speech—during an election, no less!

The effect of this is that states may silence their critics and those whose speech they do not like, and they may do so for years, while election after election proceeds.  And federal courts can do nothing about it.  This is so even though the Supreme Court has recognized "that the public begins to concentrate on elections only in the weeks immediately before they are held."  *Citizens United*, 558 U.S. at 334.  So "[t]here are short timeframes in which speech can have influence."  *Id.*  Yet "[a] speaker's ability to engage in political speech that could have a chance of persuading voters is stifled if the speaker must first [participate in] a protracted lawsuit."  *Id.*  That is certainly the case if the state can make an election speaker exhaust the state process before a federal court can even consider the speaker's claim that the state law or action violates the speaker's First Amendment rights.  While a state's "regulatory scheme may not be a prior restraint on speech in the strict sense of that term," *id.* at 335, it effectively operates as one—interfering with the speaker's ability to engage in political speech while the proceedings remain pending.

Finally, although *Younger* has left open the door to federal court in "extraordinary circumstances," *Younger*, 401 U.S. at 53–54; experience shows us that this safety valve offers no help. Since articulating this exception to *Younger*, the Supreme Court has never once found that a state initiated a prosecution in bad faith or that a state law is "flagrantly and patently" unconstitutional. Edwin Chemerinksy, Federal Jurisdiction 908–09 (7th ed. 2016).

In short, *Younger* has evolved to allow states to impose a state-exhaustion requirement on those trying to exercise core First Amendment rights. Perhaps we are meant to just put up with this result in the large majority of cases. *But see, e.g.*, *Patsy v. Bd. of Regents*, 457 U.S. 496, 516 (1982). But in cases like this one, when the federal plaintiff seeks to vindicate its right to engage in political speech during election time, *Younger* silences that plaintiff—ironically in the name of federalism. In my view, it is time for the *Younger* doctrine to be reexamined.